# MITCHELL, GOVERNOR, AND BLOXHAM, COMP-TROLLER, OF FLORIDA, *v.* FURMAN.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 23.   Argued October 17, 18, 1900.—Decided March 11, 1901.

The record considered, it is held that the jurisdiction of this court on a direct appeal from the Circuit Court may be maintained on the ground that the construction of a treaty made under authority of the United States was drawn in question.

This was a bill to remove clouds on title, and rested on appellees' alleged legal title under a Spanish grant, and cannot be sustained because the title set up was not absolutely complete and perfect prior to the treaty between the United States and Spain. As the grant needed confirmation, and had never received it, it could not be treated as constituting absolute legal title.

Even grants of land in Florida which were in fact complete and perfect prior to the ratification of the treaty might be required by Congress to have their genuineness and their extent established by proceedings in a particular manner, before they could be held valid.

Under the various acts of Congress cited, the cause of action proceeded on in this suit was barred by failure to comply with their provisions.

THIS was an amended bill of complaint filed November 30, 1895, in the Circuit Court of the United States for the Southern District of Florida by Charles M. Furman in his own right, and as administrator of the estate of Charles M. Furman; Bolivar B. Furman, and Alester G. Furman, all citizens of the State of South Carolina, against Henry L. Mitchell, Governor, William D. Bloxham, Comptroller, Charles B. Collins, Treasurer, William B. Lamar, Attorney General, and Lucius B. Wombwell, Commissioner of Agriculture, of the State of Florida, and citizens thereof, as the Board of Trustees of the Internal Improvement Fund of the State of Florida; the Florida Coast Line Canal and Transportation Company, a corporation of Florida, having its principal place of business at St. Augustine; the St. Johns Railway Company, a corporation of Florida, having

its principal place of business at Jacksonville ; Horace S. Cummings, residing in the District of Columbia ; and John A. Henderson, a citizen of the State of Florida, alleging : " That they own and hold title in fee simple, as tenants in common, to all that tract, parcel, or piece of land lying, situate, and being in the county of St. Johns in the State of Florida, and within townships seven, eight, and nine south of range thirty east, known as ' Anastasia,' or ' Saint Anastasia,' Island, said to contain ten thousand acres, but which in fact contains about seven thousand five hundred acres, excepting therefrom what was known at the time of the Spanish grant hereinafter mentioned as the King's Quarries, the boundaries of which were marked by stakes, the same being about two hundred acres, lying on and east of the old King's Road, between the same and the old lighthouse, which exception does not embrace the lands or any part thereof hereinafter alleged to be claimed by the defendants or any of them."

" That the said tract of land was granted by the government of Spain to José, or Joseph, Fish — otherwise known as Jesse Fish — (hereinafter designated as Joseph Fish), on or about the 19th day of June, A. D. 1795, which said grant was ratified and confirmed by the United States by the treaty with Spain ratified by the United States on the 19th day of February, A. D. 1821."

The bill then set up title to Anastasia Island as derived from Joseph Fish, through his mother Sarah Fish, her granddaughter, Jessie B. Perpall, who married Charles M. Furman, who became sole heir at law of his wife and their son, Gabriel, and left a will under which complainants claimed. It was averred that Joseph Fish died intestate in 1798 ; that his mother died intestate in 1825 ; that her granddaughter died intestate in 1827 ; that Mrs. Furman's son Gabriel died in infancy in 1836 ; and that Charles M. Furman died in 1872.

It was further alleged that Joseph Fish was placed in possession of the said land so granted and resided thereon in his dwelling house and cultivated an orange grove and fields, enclosed by a fence ; that he used the woodlands on the island, and exercised such acts of possession of the whole of the island

as it was capable of; and that from his death to the present time those claiming under Fish have done the same.

The bill averred that the State of Florida claimed title under the act of Congress of September 28, 1850, relating to swamp lands, of certain lands on Anastasia Island, which complainants asserted were part of the grant to Joseph Fish, and owned by them; these were described according to the public surveys and alleged to contain 1465.15 acres, more or less, all in township seven, south of range 30 east; and that the United States on September 18, 1856, issued its patent to the State of Florida therefor.

That the State of Florida by an act of January 6, 1855, vested in the governor, the comptroller, the state treasurer, the attorney general, and the register of public lands, now known as the commissioner of agriculture, of that State, and their successors in office, as the board of trustees of the internal improvement fund of the State, the title to all lands granted to the State under the act of Congress, with power to sell and transfer the same; that defendants, Mitchell, governor, and others, now constitute the board of trustees; that the board on May 13, 1885, executed a deed of conveyance to the Florida Coast Line and Transportation Company of certain lots and parts of sections, in township seven, containing in all 549 acres, being part of the lands patented to the State, which land, except that conveyed to Horace S. Cummings, was claimed by the Transportation Company adversely to complainants; that of these lands, the Transportation Company executed a deed of conveyance to Cummings of one hundred and sixty acres, which was claimed by Cummings adversely to complainants.

That the board of trustees, September 21, 1886, executed a conveyance to the St. Johns Railway Company of certain lots and parts of sections in township seven, containing in all 328.10 acres, being part of the land patented to the State, which land was claimed by the railway company adversely to complainants; that the board of trustees on July 30, 1892, executed a deed of conveyance to defendant Henderson of certain lots in township seven, containing 286.28 acres, which land was claimed by Henderson adversely to complainants. It was further averred that

the United States issued to the State of Florida on June 27, 1895, a patent for certain other lands, being part of Anastasia Island, described by the public surveys, in township seven, containing 393.30 acres; that the United States issued to the State of Florida on April 8, 1895, a patent for certain other lands described by the public surveys, in township seven, containing 120 acres; that these lands were selections made by the State under an act of Congress of June 9, 1880, entitled " An act to confirm certain entries and to warrant locations in the former Palatka Military Reservation in Florida;" that in addition to the lands so patented the State had selected under said act certain lands on Anastasia Island in township seven containing 367.32 acres; that entries of these selections had been allowed by the commissioner of the general land office of the United States, and the same were held to be patented to the State under the act of Congress of June 9, 1880; that the lands so patented to the State and those selected by the State for patent under the act aforesaid were in lieu of selections under the act of Congress of September 28, 1850, and were vested by the legislature of Florida, by the act of January 6, 1855, in said board of trustees, if the United States held the title thereto at the time of the issue of the patents, and that the board of trustees claimed title to the same adversely to complainants.

The bill charged " that the said patents from the United States and the said deeds of those claiming thereunder, and said entries and selections of the State of Florida, whereby the said defendants claim title, respectively, to the said lands as aforesaid are invalid, and do not vest a title in the said defendants to the lands so claimed by them, respectively, as aforesaid, for the reason that the United States, under whom the defendants claim, did not, at the time of issuance of such patents or at any other time, have or hold title to the said lands, or any part thereof, but that the title to the same is in your orators, holding and claiming under the said grant of the government of Spain to the said Joseph Fish as aforesaid."

The bill also alleged that none of the defendants were in actual possession of the lands or any part thereof; that the lands exceeded in value the sum of $2000; and "that this

cause arises under the said treaty between the United States and Spain, which ratified and confirmed the said grant to the said Joseph Fish, under whom your orators claim title. And the controversy involved in this case necessarily involves the construction of said treaty."

It was then charged "that the said patents, entries, and deeds by and under which the defendants respectively claim title to said lands as aforesaid, are clouds upon the title of your orators in the said lands and tend to depreciate the value and sale thereof, to the great damage and injury of your orators in the premises."

The prayer was "that the said patents, entries, and deeds by and under which the said defendants respectively claimed title to the lands so respectively claimed by them as aforesaid may be set aside and declared void as clouds upon the title of your orators, and that the defendants and each of them may be enjoined from entering upon or taking possession of said lands, or in any manner disturbing the possession of your orators thereof, and that your orators may have such other and further relief in the premises as equity may require and as to your honors shall seem meet."

The defendants Mitchell and others, members of the board of trustees, moved to dismiss the bill for want of jurisdiction, which motion was overruled. Defendant Cummings made a similar motion. The trustees also filed a demurrer for want of jurisdiction, and a demurrer for want of equity. The defendants, the Canal and Transportation Company and the St. Johns Railway Company, also demurred. All the demurrers were overruled.

The trustees and Cummings then filed their answer, denying that Anastasia Island was granted by the government of Spain to José or Joseph Fish, June 19, 1795, or at any other time, or that the title to the lands in controversy was ever granted by the King of Spain or by his lawful authorities, and averring that the only part of Anastasia Island, the title to which was ever granted by the King of Spain or by his lawful authorities, was a tract of about three hundred acres granted to Lorenzo Rodriguez in 1793, and a tract of about twenty acres granted to

F. X. Sanchez in 1802, both of which tracts had been confirmed by the United States and surveyed and platted as private grants upon the maps and plats of the land department of the United States. They denied that the treaty with Spain ratified or confirmed any grant of the lands in controversy in this suit to the ancestor of complainants or gave title thereto to any other person save only to the United States; and denied that Joseph Fish was placed in possession of Anastasia Island except the King's Quarries, as a grant thereof to him by the King of Spain or his lawful authorities, or that he or his successors exercised such acts of possession of the whole of Anastasia Island except the King's Quarries, as it was capable of, under claim of title, or that he claimed title as the owner of said island. But they said that the occupancy and acts of possession alleged, if true, applied to no other lands than those embraced in the Fish homestead, which was a point of land on the extreme west shore of Anastasia Island, nearly surrounded by water, and cut off from the main island of Anastasia, embracing about one hundred acres of land, well known by general reputation as " Fish's Island." They admitted the patenting by the United States to the State of Florida of the several tracts of land described in said bill, and averred that before any patent could be issued for these lands, the State of Florida was required to establish before the land department of the United States that the lands were vacant and unappropriated public lands of the United States; that Furman in behalf of complainants appeared before that tribunal and contested the matter, and presented and urged their claim to the same under the same title set up in the bill, and that there was a final determination by said tribunal which was adverse to complainants' claim, and decided that the lands were not private lands.

Also that in addition to the lands so patented to the State of Florida, the State had selected the lands set out in the bill, and that the entries had been allowed by the land office, and were held to be patented; and said that such allowance and holding for patent was an adjudication of a competent tribunal that the lands were public lands of the United States, which adjudication for the issue of the patent was subject to review in the land

department, and might be corrected if erroneous. They denied that the patents, deeds, entries and selections whereby defendants claim title to the lands in controversy were invalid, and asserted that the United States had title to said lands, and that it was not in complainants.

"They admit that this controversy involves the construction of the treaty between Spain and the United States, and they aver, that complainants in their said bill have set out as their title an incipient and inchoate title under the 'government of Spain,' not cognizable in the courts of the Government until recognized or confirmed by the Congress of the United States; that by the rules established in the Territory of Florida by the authority of the King of Spain for the granting of lands, a grant from the government of Spain signified only the first concession or right of occupancy of the royal domain; that perfect or complete grants were recognized by the treaty with Spain, but incomplete grants were ratified by the treaty, to the same extent they would have been valid had the territory remained under the King of Spain; that if there had been a complete grant of the Anastasia Island at the date of the treaty the owners thereof were authorized under the laws of the United States to have the same surveyed without expense as a private claim by the United States, but by the averments of their said bill complainants show that said lands have been surveyed as public lands."

The answer stated "that Anastasia Island is a barrier of the sea, consisting chiefly of high sand hills blown in from the sea beach, covered with 'scrub,' a low growth of hard wood; that through the center of the northern part, in township 7, there runs north and south a ledge of coquina rock from one half to three quarters of a mile wide; that all the lands are barren and wholly unfit for any purpose whatever save seashore residence, and of no value apart from their proximity to a city patronized as a winter resort; that on the western shore of said island, nearly separated from the main island by a strip of low ground or 'swale,' is a neck of land called Fish's Island, containing about 60 to 100 acres, which is arable land, and on this point

was an orange grove and cultivated fields of about thirty acres under enclosure, and houses and outbuildings."

It was further averred that complainants or their ancestor never had any title whatever to the lands described in the bill unless it were to a part of lots two, three and six of section 29, township 7, range 30 east, which embraced the orange grove of "Vergel" plantation, alleged to have been sold by the Spanish government in probate proceedings upon the estate of Joseph Fish about March 21, 1792; that to this plantation the heirs of Fish might have had an equitable title, but this had been forfeited by failure to present or record such claim and have it surveyed.

Defendants further said that Anastasia Island was officially turned over in behalf of the King of Spain to the United States, in 1821, as one of the adjacent islands named in the treaty, and as a part of the royal domain, and the lands delivered as such by the lawful authorities of the King of Spain to the United States, whose authorities then went into actual occupancy of part, and the possession of the whole, of Anastasia Island, save two Spanish grants, one to Rodriguez and the other to F. X. Sanchez.

That June 19, 1795, the Spanish law in force in the Floridas vesting in the Spanish governors the power to make grants of lands was the royal order of 1790, under which Governor Quesada, Spanish governor of East Florida in 1795, required ten years of continued and uninterrupted possession before full title was granted to claimants, who upon petition had received a grant or concession and had been put in possession of lands, etc.

The answer further set forth that no person except the governor of the province was entitled to make grants of land under the Spanish law, and if any other person had authority to make grants the titles so granted were incipient until confirmed by the governor, etc.; and alleged on information and belief that any proceedings purporting to be a concession for 10,000 acres, dated June 19, 1795, to Joseph Fish, found among the archives at the date of the cession, were either forgeries, or so irregular as to render their genuineness too doubtful to be accepted as evidence.

Defendants averred that any claim which Fish ever had would be found to be an alleged grant purporting to be signed by one Morales, the commandant of the third battalion of Cuba, and not by the governor, an unauthorized proceeding under Spanish law ; that no authority existed in Morales to make the grant, and no other claim in East Florida is based on action by him ; that the law required an official survey to be filed in the records and a certified copy delivered to claimants, but there was none in this instance; that the archives relating to property in Florida, both public and private, contain a complete list of all real titles or patents for lands granted by the lawful authorities of the King of Spain in East Florida, but that list contains none to Joseph Fish for the lands on Anastasia Island.

The answer restated that the lands claimed by complainants to have been granted to Joseph Fish were never segregated from the royal domain, and were not measured, bounded or platted or otherwise located-by official survey, and could not be identified by natural boundaries.

Defendants further averred that by the act of Congress of May 23, 1828, Congress confirmed all claims recommended for confirmation to the extent of a league square, and enacted that no more than a league square should be confirmed in any grant, and that no confirmation should be effectual until a full release by the claimant of all the lands claimed in any one grant in excess of a league square, but authorizing all claimants who were not willing to accept a league square to present their titles to the District Court of the United States within one year from the date of the act or be barred ; that claimants never released the excess of a league square, nor presented their claim to the District Court of the United States, as did all others having claims in Florida in excess of that amount; that the legislative council of the Territory of Florida published the acts of May 23, 1828, May 26, 1830, and February 8, 1827, with the treaty with Spain, for circulation in Florida, and though often notified of the limitations in said acts, the claimants under Joseph Fish did not avail themselves of the acts, and abandoned and forfeited their claims to said land, so that the United States would have acquired title by prescription even if the lands were private

property; that in 1833, having given public notice that unless the private claims within the district were presented to the surveyor general, he would survey the same as public land of the United States, the claim of Fish not having been presented and having been abandoned, the United States extended the surveys over all of Anastasia Island except the grants to Rodriguez and Sanchez, and in 1839 advertised the lands for sale as public lands; that on May 6, 1851, the maps and plans of said lands surveyed as public lands were formally approved by the surveyor general for Florida; that the United States patented to the State of Florida certain lands in 1866 as vacant lands, and in 1867, 1868 and 1869 a large area of lands on Anastasia Island were entered under the homestead laws of the United States, and settled upon and improved, and wood was cut therefrom and sold; that some of the homestead settlers failed to make final proof of their entries, but final proof of homestead and settlement under the homestead laws for lands on the island was made and final certificates issued to several persons named in 1875, in 1876 and in 1882; that in 1867 the trustees executed a conveyance for lands on that island to Rogero for lots 2 and 3, section 29, to Hopkins and Rogero for lot 6, section 29, and to Magruder and Logan for lots 2 and 3, section 32, all in township 7, range 30 east, being part of the lands patented to Florida; that September 16, 1868, Sanchez applied to the land department of the United States for the issue of a patent upon the Fish claim, and in 1870 Furman advised the land department that he claimed to be the owner of Anastasia Island under an alleged grant prior to 1763, and made application for the issue of a patent from the United States to him.

That from 1831 to June 22, 1860, the claim was wholly barred; that June 22, 1860, Congress again authorized claimants to present their claims, if an imperfect grant, to commissioners for confirmation, but if a complete grant, to the District Court for the Northern District of Florida, but those claiming under Fish neglected to avail themselves of this right to have the validity of their claim determined, but did apply to the land department for further adjudication; that after application to the land department for an adjudication by Furman

in 1870, Congress extended the act of June 22, 1860, until June 10, 1875, by an act approved June 10, 1872, by the second section of which act no proof of title was required of claimants, provided they and those from whom they claimed had held continuous possession of the lands claimed; that having submitted their claim to a tribunal of their own choice they are now estopped to deny its jurisdiction.

That in June and July, 1888, the State of Florida applied to the land office at Gainesville to enter certain portions of land at the north end of Anastasia Island under the act of June 8, 1880, as vacant and public land, but because there was on file at the land office a letter from the commissioner dated March 7, 1887, advising that the island was claimed by Furman, and that the claim had not been adjudicated by the land department, the register and receiver rejected the selections of Florida, and the State appealed to the commissioner; that the claim of Furman was taken under advisement by the commissioner on briefs submitted by the State, and by Furman and others claiming under Fish, and on August 2, 1890, the commissioner rendered his decision that the lands were public lands of the United States, whereupon complainants took an appeal from the decision of the commissioner to the Secretary of the Interior, and submitted arguments in support of their contention that the said lands were owned by them under a valid Spanish grant, and on June 22, 1893, the Secretary rendered his decision affirming the decision of the commissioner, that said claim had no validity; that complainants failed to file any motion for review and the decision became final, and is a complete and final adjudication of complainants' want of title, and that the lands were public lands subject to disposal by the United States; that complainants caused a bill to be introduced in the Fifty-third Congress for confirmation and release to them by the United States of the lands on Anastasia Island as claimed under Fish, but Congress refused to consider the same.

The answer denied that complainants were in possession of any part of the land on Anastasia Island, and set forth the possession of many persons claiming title under the United States. It averred that the St. Augustine and South Beach Railroad

Company was in possession of a roadbed and right of way across the island through sections 17, 21, 27 and 28 in township 7, range 30 east, under authority of an act of Congress approved March 3, 1875, granting a right of way over the public lands of the United States; that lot one of section 21 was reserved for lighthouse purposes by order of the President dated June 22, 1869; that part of lot two of section 21 of township 7 was declared a reservation for lighthouse purposes by order of the President dated February 1, 1883; that afterwards by a like order the remainder of said lot two was declared a United States reservation for lighthouse purposes; and that by executive order dated May 4, 1893, the President reserved 700 acres of land in sections 21, 22 and 28 of township 7 for military purposes.

That the requirement by Congress that all claimants under grants from the King of Spain in the Floridas should relinquish all in excess of a league square of the lands claimed in any one grant, was a declaration of the policy of the political department of the United States as to the territory acquired from a foreign power and a determination by Congress of the extent of the obligations imposed on the United States by the treaty with Spain.

The answer further averred that the failure to release the excess forfeited the entire claim, and that, without any release, the excess over a league square was subject to sale as public land; that the issue of the patents depended upon the existence of facts which the land department of the United States had determined existed; that by the survey of the lands of Anastasia Island as public lands and their offer for sale by the proclamation of the President, and confirmation of portions thereof to the State of Florida by patent, the reservation of portions thereof by executive order, and the opening of all to homestead entry, the United States had become seized of the whole of said Anastasia Island by the equivalent of office found.

The St. Johns Railway Company and the Florida Canal and Transportation Company also filed an answer of similar purport. Numerous exceptions to these answers were filed and some of them were sustained to certain paragraphs. Replication having been filed, the cause was referred to a master, who

subsequently made a report containing findings of facts, findings of mixed law and fact, and conclusions of law, to which numerous exceptions were filed by defendants, all of which were overruled by the court, and a decree was entered in accordance with the prayer of the bill and the recommendations of the report. A decree *pro confesso* was entered against John A. Henderson.

From this decree all the defendants except Henderson, in respect of whom an order of severance was entered, prosecuted this appeal.

The master also filed with his report an elaborate and careful opinion on the whole case.

Complainants introduced in evidence from the American State Papers, Public Lands, vol. IV, Duff Green edition, 256, "Minutes of the proceedings of the commissioners appointed to ascertain claims and titles to land in East Florida for the year 1824."

Meeting of the board, March 29, 1824, pursuant to an act of Congress of February 28, 1824.

Meeting, September 13, 1824, when "Sarah Fish, 10,000 acres; same 500 acres," and three other "cases being called and not being prepared for trial," were "placed at the foot of the docket."

Minutes of meeting, March 28, 1825, pursuant to the act of Congress of March 3, 1825. April 21, 1825 : "Permission was given by the board to the executors of the estate of Sarah Fish, deceased, to amend the memorials in the claims of said Sarah Fish."

December 16, 1825 : "The following claims were this day reported to Congress for confirmation, viz: . . . Sarah Fish's heirs, for ten thousand acres; . . ."

Report of commissioners to the Secretary of the Treasury, January 31, 1826, transmitting claims and titles examined and disposed of, class three comprehending "claims exceeding 3500 acres, the titles to which were found among the public archives of the country, and are ascertained by the commissioners to be valid Spanish grants, and reported accordingly to Congress for confirmation." 4 Am. State Papers, Public

Lands, D. G. ed., p. 276. The Fish claim was included in class No. three, as follows:

*" Register of claims to land exceeding 3500 acres in East Florida, which are founded on patents or royal titles derived from the Spanish Government, and which in the opinion of the commissioners are valid.*

| Number. | Names of— | | Date of the patent or royal title. | Date of the concession or order of survey. | Quantity of land. | | By whom conceded. | Authority or royal order under which the concession was granted. | Conditions. | Date of survey. | By whom surveyed. | Where situated. | Occupation and cultivation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Present claimants. | Original claimants. | | | Acs., hdths. | | | | | | | | From. | To. |
| * | * * | * * | * | * | * | * | * | * | * | * | * | * * | * | * |
| | | | | | Cases reported this session. | | | | | | | | | |
| 21 | Heirs of Jessie Fish. | Jessie Fish | ..... | 19 June, 1795. | 10,000 | | Morales. | 1790 | Complied with. | ... | ... | Anastasia Island. | | |
| * | * * | * * | * | * | * | * | * | * | * | * | * | * * | * | * |

The petition of Mrs. Fish, dated August 31, 1823, asserted that she " claims title to the island lying in front [*i. e.*, to the east] of the city of St. Augustine, and running south about eighteen miles, more or less, along the east bank of the river Matanzas, known by the name of the island of St. Anastasia, supposed to contain ten thousand acres, as belonging to the deceased husband, Jesse Fish, Senior, in the year 1763. That in the year 1792 this island was sold at public sale by order of the Spanish governor, Quesada, when her son, the late Jesse Fish, Jr., deceased, became the purchaser."

Accompanying this memorial were certain papers and proceedings as follows: A petition of Jose Fish, (erroneously dated December 2, 1796,) stating that at the auction of his father's property for the payment of his creditors, he purchased the place called The Vergel for $1605, which sum he gave only with a view to the fruit trees of said place, and the timber which is on the land belonging to it, as the land is entirely useless for planting; that several of the neighbors had been cutting the wood, and therefore he begs to be declared owner of the lands which his said father possessed, annexed

to the place of the Orange Grove, which, according to the deeds granted in the time of the British possession, amounted to 10,000 acres, whether as a new settler or by the right which his deceased father had to them. That if he does not obtain this favor he will consider himself the loser of the greatest part of his purchase, because the lands will not produce crops of any kind and a great number of the fruit trees have dried up, which is likely to occur to the balance of them.

Governor Quesada, who described himself as "brigadier of the infantry of the royal armies, governor, commander in chief, vice royal patron, and sub-delegate of the royal domain of this city of St. Augustine, Florida, and its province, for His Majesty," referred the petition December 15, 1794, to the assessor general, who, on the same day, reported that if Fish had asked to prevent trespassing or to recover possession, he would render an opinion, but as Fish asked to be declared owner, it was for the governor to determine judicially the extent of Fish's purchase or his right as a new settler.

Thereupon Governor Quesada directed Fish to make proof of the facts on which he based his right or claim to favor.

Sundry depositions were then taken, and the governor on the 12th of February, 1795, referred the petition and proof to the collector of the exchequer, that as fiscal of it he may represent him in the discharge of his functions. February 27 the fiscal reported that at the sale of the orange grove to Joseph Fish, the boundaries of the land were not taken into consideration, and only the valuation of the trees within the orchard was made, without including the 10,000 acres of land annexed to it. And he was of opinion that Fish was not entitled to anything more than he could prove by the inventory, valuation and sale, and that after this land had been laid off, the remainder ought to be sold as belonging to his deceased father and for the benefit of the creditors of his estate; that the inventory, valuation and sale of the orchard should be annexed; and that in case Fish had occasion for the use of more public land, and without injury to a third person, the fiscal minister did not find any objection to granting them to him as a new settler, "according to what His Majesty has commanded of this particular."

The governor then directed, March 6, 1795, that the testimony indicated "be placed in continuation and with it those proceedings returned to the assessor general, that he may consult with me as to what is proper as respects the other points to which the foregoing fiscal representation refers."

The inventory, valuation, and sale of the orange grove in 1792, was accompanied by the commission of the governor dated January 18, 1792, appointing the appraisers, and specifying the "9th item" thus : "The place called 'El Vergel,' which belongs to the deceased, although the title under which he enjoyed it does not appear in the proceedings."

March 26, 1795, this entry was made by the governor : "Seen : Passed over to Don José Fish : Thus decrees and orders Senor Don Juan Nepomuceno de Quesada, brigadier of the infantry of the royal armies, governor, Commander General, Vice Royal Patron, and Subdelegate of the Royal Domain of this City of St. Augustine, Florida, and its province, for His Majesty, who signs it, with the opinion of Senor the assessor general, the twenty-sixth of March, one thousand seven hundred and ninety-five."

There then appears a new petition by Fish, without date, setting out that he is a new settler in the province ; that the above mentioned documents have been given him, and he, being advised of their contents as also of the sale at auction of The Vergel, considers that the fiscal was in error when he reported adversely on the first petition ; that he has produced proof that his father had ancient possession of "El Vergel," for which he paid an excessive price, and prays that a grant of "said island" be made to him, and that a copy of the writing which he presented to the notary after the sale, asking for the island at a valuation, be placed in continuation.

On April 17, 1795, the assessor general, Ortega, who recites that he is "advocate of the royal council, lieutenant governor, auditor of war, and assessor general of the city of Saint Augustine, Florida, and its province, for His Majesty, who signs it in consequence of the illness of the governor and commander-in-chief," directed that the copy be put in continuation, and the whole passed over to the representation fiscal. The writing

referred to is dated March 22, 1792, and Fish states therein that at the public sale, the day before, of the property of his father, there was no person who would bid "for the island del Vergel;" that he obligated himself to pay $1605; and "he prays your excellency to have the kindness to order that he be placed in possession of it." On May 4, 1795, the first officer of the chief comptroller's department, "and who is charged with the administration and court of justice of the royal treasury on account of the illness of his excellency, the governor, and as attorney fiscal of the royal treasury," reviewed the papers, and concluded that under the circumstances the governor might "order the boundaries of the Vergel to be marked off to the number of 10,000 acres." This was followed by this entry: "Having examined the proceedings, it was thus decreed and ordered by Senor Don Bartolome Morales, colonel of the infantry of the royal armies, commandant of the third battalion of Cuba which garrisons this city of Saint Augustine, Florida, and political and military governor of it and its province, from the indisposition of the governor, who signed it on the sixteenth of May, 1795; which I attest." This was signed by Morales,. and attested by Ortega, assessor general, before the notary.

June 12, 1795, Morales and Ortega directed notice to be given to the defender of the estate of Fish, and that the proceedings be returned.

June 17, 1795, the defender of the estate reported that the 10,000 acres might be granted.

Then follow the alleged grant and delivery of possession, namely:

"Having examined those proceedings and seen the proof adduced in them by Don José Fish, it appears not only that his father of the same name possessed since the time of the old Spaniards and in that of the British dominion the 10,000 acres of land, possession of which he claims at the place called the Orange Grove, which he purchased at public auction, but also that he made a bid for the said land, under which his purchase ought to be understood, which defect in not explaining it thus at that time should not be prejudicial to him, and has given cause to

this litigation. His excellency said that declaring it, as he declared now, he ordered in consequence that whether by the right which the burdensome acquisition of the said land gives Fish, which cost him 1605 dollars, which it appears he paid for the purchase of the Orange Grove, or by the right which the ancient possession of his father gives him to the said 10,000 acres of land, or finally in consequence of the petition of Fish, that they should be granted to him as a new settler, he be placed in possession of the said land, which it appears his said father possessed, and which is already laid off, with the reserve of the quarries, and the remainder, which was not granted to his said father, and which the King has reserved, renewing, in case of necessity, at the cost of the interested, the boundaries by said appraisers, Don Manuel Solana, who at the time of the old Spaniards and at the new possession by them of the province laid off by order of the government, the aforesaid quarries, to give possession, as is proven, to the father of the memoralist of the land which he claims, and let them be granted to him on the terms above set forth, the present notary, who is commissioned for the purpose, when with the said appraisers, and any other workman that may be necessary, he shall assist at marking the boundary, at which also shall assist, to represent the royal treasury, the person whom the minister of the royal domain may depute for the purpose. All of which shall be made appear on the proceedings with which, and the taxation of the costs, which the interested shall satisfy, this proceeding shall be held as concluded. It was thus decreed and ordered by Senor Don Bartolome Morales, colonel of infantry of the royal armies, commandant of the third battalion of Cuba, which garrisons this city of St. Augustine, Florida, and political and military governor, who signed this, with the opinion of his honor the assessor general, on the 19th June, 1795, which I attest.

"BARTOLOME MORALES.

"LICENTIATE JOSEF DE ORTEGA."

"*Proof of boundary and possession.*

"Being at the plantation called the Orange Grove, in the island of St. Anastasia, on the tenth of July, 1795, in conformity

with what is provided in the foregoing decree, we proceeded to the marking the boundaries of the land comprised in these proceedings. Don Manuel Solano, the appraiser appointed for the purpose, passing from said place to where the quarries of the King and of individuals are situated, who, passing along the ancient boundaries with Don José Lorente, chief master of the royal works, who accompanied him to inform himself, Don Tadeo Arribas, officer of the royal comptroller's office, from the employment of the collector, for his fiscal cognizance, and I, the present notary, went fixing up stakes to point out said boundaries across the island, and separated the said quarries, saying that all besides them was what corresponded to Don José Fish; to whom, being also present, I, the said notary, in discharge of the commission which was conferred upon me, put him in possession of the land pointed out, leading him into it by hand, and riding together on horseback by various places, until arriving at the dwelling house; all of which I did as a token of said possession, which he took quietly, peaceably, and without contradiction. In testimony of which and for the due proof I have extended the present proceedings, which all signed with the exception of Solano, who said he did not know how."

Signed by Arribas, Lorente and Fish.

The Secretary of the Treasury transmitted the report of the commissioners, with the evidence and decisions, to Congress, February 21, 1826. Vol. 4, p. 400.

The act of Congress of May 8, 1822, 3 Stat. 709, c. 129, provided that "for the purpose of ascertaining the claims and titles to lands within the territory of Florida, as required by the treaty," commissioners should be appointed with power "to inquire into the justice and validity of the claims filed with them," but not to have "power to confirm any claim or part thereof where the amount claimed is undefined in quantity, or shall exceed one thousand acres; but in all such cases shall report the testimony with their opinions to the Secretary of the Treasury, to be laid before Congress for their determination." A surveyor was also to be appointed.

Section 4 provided that "every person, or the heirs or representatives of such persons, claiming title to lands under any

patent, grant, concession, or order of survey, dated previous to the twenty-fourth day of January, one thousand eight hundred and eighteen, which were valid under the Spanish government, or by the law of nations, and which are not rejected by the treaty ceding the territory of East and West Florida to the United States, shall file, before the commissioners, his, her, or their, claims, setting forth, particularly, its situation and boundaries, if to be ascertained, with the deraignment of title, where they are not the grantees, or original claimants; which shall be recorded by the secretary, . . . and said commissioners shall proceed to examine and determine on the validity of said patents, grants, concessions, and orders of survey, agreeably to the laws and ordinances heretofore existing of the government making the grants, respectively, having due regard, in all Spanish claims, to the conditions and stipulations contained in the eighth article of a treaty concluded at Washington, between His Catholic Majesty and the United States, on the twenty-second of February, one thousand eight hundred and nineteen; but any claim not filed previous to the thirty-first day of May, one thousand eight hundred and twenty-three, shall be deemed and held to be void and of none effect."

This act was amended by an act approved March 3, 1823, 3 Stat. 754, c. 29, confining the existing board of commissioners to West Florida, and authorizing the appointment of three commissioners for East Florida. The second section of this act provided that in the examination of titles, the claimant or claimants "shall not be required to produce in evidence the deraignment of title from the original grantee or patentee, but the commissioners shall confirm every claim in favor of actual settlers at the time of cession of the said territory to the United States, where the quantity claimed does not exceed thirty-five hundred acres, where such deraignment cannot be obtained, the validity of which has been recognized by the Spanish government, and where the claimant or claimants shall produce satisfactory evidence of his, her, or their right to the land claimed. And said commissioners shall have the power, any law to the contrary notwithstanding, of deciding on the validity of all claims derived from the Spanish government in favor of actual settlers,

where the quantity claimed does not exceed three thousand five hundred acres."

It was enacted by the fifth section "that all claims not filed with the commissioners of the district, where the land claimed is situated, in the manner prescribed by the act to which this is an amendment, on or before the first day of December next, shall be held to be void and of none effect."

The act further provided for the appointment of a surveyor for the territory, for the opening of land offices in each district, and for the appointment of a register and a receiver for each of said offices.

February 28, 1824, an act was passed, 4 Stat. 6, c. 25, which extended the time limited for the settlement of private land claims in Florida by the act of March 3, 1823, until January 1, 1825; declared that no person should be taken and deemed to be an actual settler unless he, or those under whom he claimed title, should have been in the cultivation or occupation of the land at and before the period of the cession; and that it should be lawful for claims to be filed any time previous to September 1, 1824, "but all and every claim not filed by that time, shall be held and deemed void and of none effect."

On the third of March, 1825, another act was passed, 4 Stat. 125, c. 83, which provided that it should "be lawful for claims to be filed before the board of commissioners in East Florida any time prior to the first day of November, one thousand eight hundred and twenty-five;" and the commissioners were authorized to continue their session until the first Monday of January, 1826. The act provided for the appointment of keepers of the public archives.

February 8, 1827, an act was passed, 4 Stat. 202, c. 9, to confirm title to lands and lots favorably passed on or reported not exceeding thirty-five hundred acres. This act provided "that the several claimants to land in said district, whose claims have not been heretofore decided on or filed, before the late board of commissioners, be permitted to file their claims, and the evidence in support of them, with the register and receiver of said district, and evidence in support of those filed before said board, at any time before the first of November next, whose duty it

shall be to report the same, with their decision thereon, and those already filed, to the Secretary of the Treasury, on or before the first day of January, one thousand eight hundred and twenty-eight, to be laid before Congress at the next session." Surveys were to be made and certificates granted, and claims for which the surveyor refused to issue certificates designated on the township plats. Holders of claims exceeding 3500 acres were required to furnish the surveyor with such information as would enable him to exhibit the claims on said plats.

This was followed by the act of May 23, 1828, 4 Stat. 284, c. 70, which confirmed claims which had been recommended for confirmation " to the extent of the quantity contained in one league square, to be located by the claimants, or their agents, within the limits of such claims or surveys filed, as aforesaid;" "that no more than the quantity of acres contained in a league square, shall be confirmed within the bounds of any one grant; and no confirmation shall be effectual until all the parties in interest, under the original grant, shall file with the register and receiver of the district where the grant may be situated, a full and final release of all claim to the residue contained in the grant; and where there shall be any minors incapable of acting within said territory of Florida, a relinquishment by the legal guardian shall be sufficient; and thereafter the excess in said grants, respectively, shall be liable to be sold as other public lands of the United States."

The fourth section provided that the register and receiver should continue to decide the remaining claims in East Florida, subject to the same limitations and in conformity with the provisions of the several acts of Congress for the adjustment of private land claims in Florida, until the first Monday in the next December, when they should make a final report of all the claims aforesaid in said district to the Secretary of the Treasury; and provided that it should never be lawful after that time for any of the claimants to exhibit any further evidence in support of said claims.

It was further enacted by section six " that all claims to land within the territory of Florida, embraced by the treaty between Spain and the United States of the twenty-second of February,

one thousand eight hundred and nineteen, which shall not be decided and finally settled under the foregoing provisions of this act, containing a greater amount of land than the commissioners were authorized to decide, and above the amount confirmed by this act; and which have not been reported, as antedated or forged, by said commissioners, the register and receiver, acting as such, shall be received and adjudicated, by the judge of the superior court of the district in which the land lies, upon the petition of the claimant, according to the forms, rules, regulations, conditions, restrictions, and limitations prescribed to the district judge, and claimants in the State of Missouri, by act of Congress, approved May twenty-six, eighteen hundred and twenty-four, entitled ' An act enabling the claimants to land within the limits of the State of Missouri, and territory of Arkansas, to institute proceedings to try the validity of their claims;' *Provided*, That nothing in this section shall be construed to authorize said judges to take cognizance of any claim annulled by the said treaty, or the decree ratifying the same by the King of Spain, nor any claim not presented to the commissioners or register and receiver, in conformity with the several acts of Congress, providing for the settlement of private land claims in Florida." An appeal was provided for from the decision of the Judge of the District Court to this court within four months after the decision should be pronounced.

The twelfth section read: ." That any claims to lands, tenements, or hereditaments, within the purview of this act, which shall not be brought by petition before said court within one year from the passage of this act, or which, after being brought before said court, shall on account of the neglect or delay of the claimant, not be prosecuted to a final decision within two years, shall be forever barred, both at law and in equity ; and no other action at common law, or proceeding in equity, shall ever thereafter be sustained in any court whatever."

The act of May 26, 1824, 4 Stat. 52, c. 173, in respect of land claims in Missouri and Arkansas, which " might have been perfected into a complete title " under the prior government, provided that it might be lawful for claimants to lands in Missouri and Arkansas to institute proceedings to try the validity of their

claims in the manner set forth; that the court should have full power and authority " to settle and determine the question of the validity of the title, according to the law of nations, the stipulations of any treaty, and proceedings under the same; the several acts of Congress in relation thereto; and the laws and ordinances of the government from which it is alleged to have been derived; and all other questions properly arising between the claimants and the United States."

The decision of this court, if an appeal were taken, or, if not, of the court below, was to be final and conclusive. By the fifth section of the act, any claim not brought before the court within two years, or not prosecuted to final decision within three years, was barred.

May 26, 1830, 4 Stat. 405, c. 106, an act was passed confirming the claims and titles to lands filed before the register and receiver of the land office acting as commissioners in the district of East Florida under the quantity contained in one league square, which had been recommended for confirmation, and referred to Congress January 14, 1830; " and all the remaining claims which have been presented according to law, and not finally acted upon, shall be adjudicated and finally settled upon the same conditions, restrictions, and limitations, in every respect, as are prescribed by the act of Congress approved twenty-third May, one thousand eight hundred and twenty-eight."

By the eighth section, claimants who were entitled to avail themselves of the act of May 23, 1828, or might avail themselves of the provisions of this act, by taking a quantity of land equal to a league square in lieu of the whole grant, were allowed a further time of one year from the passage of the act in which to make their relinquishments, etc.

By an act of June 22, 1860, 12 Stat. 85, c. 187, "for the final adjustment of private land claims in the States of Florida, Louisiana and Missouri, and for other purposes," claimants of lands lying within those States by virtue of any grant, concession, order of survey, permission to settle, or other written evidence of title, emanating from any foreign government, bearing date prior to the cession to the United States, were authorized

to make application for confirmation of their title to lands so claimed, and the registers and receivers of the land offices in Florida were appointed commissioners to hear and decide under such instructions as might be prescribed by the commissioner of the general land office, and according to justice and equity, in a summary manner, such claims within the district aforesaid as came within the provisions of the act. The claims were to be divided into three classes, first, all claims which in their opinion ought to be confirmed where the lands claimed had been in possession and cultivation by the, private claimants or those under whom they derived title for a period of at least twenty years preceding the date of the filing of the claim, by virtue of some grant, concession, order of survey or permission to survey, or other written evidence of title ; second, all claims which in their opinion ought to be confirmed, where the lands were claimed under written evidence of title, but where there had been no actual cultivation or possession for a period of twenty years ; third, all claims which in their opinion ought to be rejected ; that whenever the commissioner of the general land office should approve the report of the commissioners in cases embraced in classes first and second, he should report the same to Congress for its action ; and that whenever it should appear that the lands claimed and the title to which might be confirmed had been sold in whole or in part by the United States prior to confirmation, or where the same could not be surveyed or located, the party in whose favor the title was confirmed should have the right to enter upon any of the public lands of the United States a quantity of land equal in extent to that sold by the government.

Section 11 provided for proceedings where lands had not been possessed or cultivated for twenty years, but were claimed " by complete grant, or concession, or order of survey, duly executed, or by other mode of investiture of the title thereto in the original claimant or claimants, by separation thereof from the mass of the public domain," by petition in any District Court of the United States, within whose jurisdiction the lands or any part thereof might lie; and for an appeal from the decree to this court.

Section 12 enacted that the act should remain in force for five years, unless sooner repealed, "and all claims presented or sued upon according to the provisions of this act within the said term of five years, may be prosecuted to final determination and decision, notwithstanding the said term of five years may have expired before such final determination and decision."

The provisions of this act were extended by an act of June 10, 1872, 17 Stat. 378, c. 421, putting it in force for a period of three years; and it was provided that all persons claiming land as specified in the first section of the act might have their claims confirmed, in all cases where it should be satisfactorily proved that the claimants, and those from whom they derived title, had "held continuous possession of the land claimed, from the date of the cession to the United States of the territory out of which" the State of Florida was formed.

*Mr. William Whitwell Dewhurst* for appellants.

*Mr. Francis P. Fleming* for appellees. *Mr. Horatio Bisbee, Mr. Francis P. Fleming, Jr.,* and *Mr. C. D. Rinehart* were on his brief.

MR. CHIEF JUSTICE FULLER, after making the above statement of the case, delivered the opinion of the court.

Appellees submitted motions to dismiss or affirm, the consideration of which was postponed to the hearing on the merits.

The contention is that the appeal should have been taken to the Circuit Court of Appeals and not to this court.

We do not concur in that view. The bill alleged "that this cause arises under the said treaty between the United States and Spain, which ratified and confirmed said grant to the said Joseph Fish, under whom your orators claim title. And the controversy involved in this cause necessarily involves the construction of said treaty."

By motions to dismiss and demurrers appellants set up various objections to the jurisdiction of the Circuit Court, the disposition of which involved the construction of the treaty. These

being overruled, appellants by their answer admitted " that the controversy involves the construction of the treaty between Spain and the United States; . . . that perfect or complete grants were recognized by the treaty with Spain, but incomplete grants were ratified by the treaty, to the same extent they would have been valid had the territory remained under the King of Spain."

It was contended on the one hand that the title was absolutely confirmed by the treaty, and on the other that as this was not a suit brought under any of the acts of Congress in that behalf, the treaty could not be held to be self-executing.

The pleadings, the evidence, and the master's report and opinion considered, we think that rights under the treaty were so far set up and relied on as to give jurisdiction to the Circuit Court, and to justify an appeal from its decree directly to this court. The record differs from that in *Muse* v. *Arlington Hotel Company*, 168 U. S. 430, which fell short of affording adequate grounds for the maintenance of our jurisdiction.

This is a bill to remove clouds on title, and rests on complainants' alleged legal title, connected with possession.

The general rule is that complainants in such suits must be in actual possession. *Frost* v. *Spitley*, 121 U. S. 552. And such is the rule in Florida, where, however, it is enough if the land be wild and unoccupied, or if some independent head of equity jurisdiction exists. *Richards* v. *Morris*, 39 Florida, 205; *Hughes* v. *Hannah*, 39 Florida, 365, 376; *Sloan* v. *Sloan*, 25 Florida, 53.

In this case actual possession was claimed of a plantation styled the Orange Grove, of about one hundred acres, situated on what was called "Fish's" Island, which the master found was not an island in itself, but part of Anastasia Island; and constructive possession of the whole of Anastasia Island, a certain part excepted as reserved. Relief was not sought as to the Orange Grove, and some homesteads, and proof was introduced tending to show that the tracts in controversy were wild and unoccupied. It was insisted as to them that the legal title drew possession to it.

The master found as matter of mixed law and fact that the lands granted to Jesse Fish in 1795 were " an island, well known

and designated by name, and entirely surrounded by water," and that they were completely and sufficiently segregated from the royal domain by proceedings taken under the decree of 1795, and Fish placed thereby in possession thereof; that the grant and the segregation of the lands from the royal domain constituted " a complete and perfect title to the said land, to wit, to the whole of the island of St. Anastasia," certain lands, " marked off by the officials as reserved," excepted.

He also found that " on August 31, 1823, Sarah Fish presented her memorial to the board of commissioners appointed by Congress to investigate as to land claims in East Florida, claiming title to the Island of St. Anastasia under the grant to Jesse Fish in 1795, aggregating ten thousand acres of land; that on December 16, 1825, the board of commissioners for East Florida reported to Congress the claim of Sarah Fish, heir to Anastasia Island, for ten thousand acres, as a valid claim for confirmation, and that said claim was reported to Congress by the Secretary of the Treasury of the United States for confirmation, with his report under date of February 23, 1826."

The master ruled as matter of law "that the grant of Fish, being a valid and complete title, properly segregated from the public domain prior to January 24, 1818, stood ratified and confirmed both by the King of Spain and the United States by virtue of the eighth article of the treaty of cession. That this grant, having been passed upon by the commissioners of East Florida under the acts of Congress and reported by them to Congress for approval as a valid grant in 1826, was further confirmed as to its validity by the United States by the act of Congress of May 23, 1828. That the limitation in the twelfth section of the act of 1828 and the acts supplemental thereto and amendatory thereof, enacted by Congress in regard to private land claims in Florida, did not apply to complete valid grants of land properly segregated from the royal domain and in possession by the grantees prior to January 24, 1818, and therefore did and do not apply to the grant to Fish so as to bar the present action."

If then the limitations of the acts of Congress properly applied to complete and perfect titles and this was such, or if they

applied to the claim of Fish because it was not such a title, or under the particular circumstances, the conclusions reached were erroneous, and the decree must be reversed.

And, apart from these limitations, if the grant did not amount to an absolute title, requiring no confirmation, the bill, of course, could not be maintained.

It must be remembered that this is not a suit under any of the acts passed by Congress in reference to the settlement of claims in East Florida, but entirely independent of them. According to the theory of appellees, those acts have no application whatever. Appellees assert their title to have been absolutely perfect and complete prior to the treaty, and, in any aspect, they must stand or fall by their contention that the Fish grant was a complete and perfect royal title.

And while we can perceive that equitable grounds may have justified the recommendation to Congress for confirmation in 1826, we cannot hold as matter of law that a grant couched in the terms of this one, and not made by the governor of East Florida or ratified by him, was an absolute conveyance of the fee.

By the Spanish law the King was the source and fountain of title to all lands, which could only be disposed of by him, or his duly authorized representative. In the Province of East Florida the governor acted in the granting of lands in the name and by the authority of the King as his direct representative. It was in that point of view that Quesada described himself as " vice royal patron and subdelegate of the royal domain." Quesada was governor from July 13, 1790, to July 20, 1796. His last participation in the matter of Fish's application was on March 26, 1795, when the papers were returned to Fish. What appears afterwards purports to have been done by one Morales during an alleged illness of the governor. There is nothing to indicate that Governor Quesada was not in the exercise of the duties of his office during his entire term, except the mere recitation in these papers. There is no evidence that Morales performed the duties of the office of governor unless the single act under consideration is to be so treated, and that would not make out a *de facto* incumbency, if there could be such, which,

as to the exercise of this power, we cannot concede. There is no pretence that Morales was appointed governor *pro tempore*, and indeed he could not have been save by the King, or the captain general of Cuba and the Floridas, which appointment would have been formally made and duly recorded. 2 White's New Recopilacion, 270, 271. No evidence to that effect was introduced. Morales clearly cannot be held to have had the power to make a royal grant, nor was any ratification of what he did do shown.

In *United States* v. *Arredondo*, 6 Pet. 691, and in *United States* v. *Peralta*, 19 How. 343, it was held in view of the rules of decision prescribed by the statutes under which the courts exercised jurisdiction, that it was the intention of Congress that a claimant should not be required to offer proof as to the authority of the official executing the grant, but that the court would assume as a settled principle that a public grant was to be taken as evidence that it was issued by lawful authority. But under the act of March 3, 1891, creating the Court of Private Land Claims, inasmuch as it was made essential before a grant could be held legally valid that it must appear that the title was "lawfully and regularly derived," it was held that such presumption could not be indulged in; that the language of the act imported "that the court must be satisfied, from all the evidence, that the official body or person assuming to grant was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified." *Hayes* v. *United States*, 170 U. S. 637. The question involved in that case was whether the territorial deputation of New Mexico had authority to make the grant in controversy. Mr. Justice White, delivering the opinion, said, among other things: "Further, while it is reasonable to presume that any order or decree of the supreme executive of Mexico conferring authority to alienate the territorial lands or ratifying an unauthorized grant to the extent authorized by law was made matter of official record, the petition does not aver and the grant does not recite, nor was there any evidence introduced showing a prior authorization or subsequent ratification. In fact, it was not even shown that at or about the time of the grant the territorial deputation habitually

assumed to grant lands, particularly under circumstances which would justify an inference that the supreme executive was informed of such procedure."

In *Crespin* v. *United States*, 168 U. S. 208, which was a case under the act of 1891, it was held that the presumption indulged in *United States* v. *Arredondo* could not supply the want of power in the alleged granting officer.

In the case at bar, as we have said, complainants were not proceeding under any act of Congress permitting the United States to be sued, but as at common law, and on the basis of absolute legal title. That title they were obliged to make out, and could only avail themselves of such presumptions as would ordinarily obtain. Without going into the question of the presumptions which might on occasion be indulged in, it is enough to say that it is clear that where the officer who assumed to convey the public domain had no authority *ex officio* to do so, such authority cannot be presumed from the mere fact of the conveyance in the absence of other evidence.

We do not think that Governor Quesada could have delegated his power as subdelegate, and it cannot be assumed that he attempted to do so.

But, furthermore, we are not persuaded that Morales undertook to make an absolute grant in fee. He did not profess to be acting as "Vice Royal Patron and Subdelegate of the Royal Domain." The grant did not run in the name of the King; did not purport to make the grant as "in absolute property;" did not assert the legal right to make such a grant; and the terms of the paper were consistent with a grant of possession merely, or, at the most, of a concession, which required a title in form to be subsequently issued.

The report of the land commissioners of January 31, 1826, transmitting the Fish claim among others, (4 American State Papers, "Public Lands," D. G. ed., 276,) states: "A royal title is the highest order of title known by any law, usage, or principle, in the province of East Florida. Titles of this description were designed to convey the fee simple to the grantee; they were usually made by the acting governors of the province in the name of the King; they recited the grant to be 'in perpe-

tuity,' and also the specific metes and bounds of the land. . . . This title may be said to correspond in character with that of a patent issued by our Government. Concessions without condition are understood to differ from a royal title only in this, that most of the latter recite the metes and bounds, whereas the unconditional concession, although definite in quantity and location of the land, is still subject to a survey; which, when made, was followed up by maturing the concession by a royal title. . . . There is also a peculiarity in the phraseology of a royal title; in all the grants of this nature, the legal right to grant the lands is asserted."

The commissioners regarded the grant in question as a concession without condition, or with conditions fulfilled, and reported it as such for confirmation. They attributed it to the royal order of 1790 in respect of settlers. 1 Clarke's Land Laws, 994, 996; 2 White, 276; *United States* v. *Clarke*, 8 Pet. 436.

Referring to class one, being claims to lands not exceeding 3500 acres in quantity, they made the observations already quoted, and further said: "In deciding on the cases comprehended in this class, the board have in all cases of royal titles and concessions without condition, where the documents were found amongst the archives of the country, and no allegations on the part of the United States appearing against them, considered themselves bound to grant certificates of confirmation to the claimants. . . . Number three comprehends claims exceeding 3500 acres, the titles to which were found amongst the public archives of the country, and are ascertained by the commissioners to be valid Spanish grants, and reported accordingly to Congress for confirmation."

The question on this branch of the case is not whether the grant should have been confirmed, but whether it amounted to a complete title without confirmation. At the time of the cession was further action of the government required to perfect it? As it was not in itself a royal title and was neither made nor confirmed by the lawful authorities of the King, we think such action was necessary.

But were this otherwise it seems to us clear that the limitations of the acts of Congress applied.

Articles II and VIII of the treaty between the United States and Spain, concluded February 22, 1819, ratified by Spain, October 24, 1820, and by the United States February 19, 1821, read as follows:

"Article II. His Catholic Majesty cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the eastward of the Mississippi, known by the name of East and West Florida. The adjacent islands dependent on said provinces, all public lots and squares, vacant lands, public edifices, fortifications, barracks, and other buildings, which are not private property, archives and documents, which relate directly to the property and sovereignty of said provinces, are included in this article. The said archives and documents shall be left in possession of the commissaries or officers of the United States, duly authorized to receive them."

"Article VIII. All the grants of land made before the 24th of January, 1818, by His Catholic Majesty, or by his lawful authorities, in the said territories ceded by His Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid if the territories had remained under the dominion of His Catholic Majesty. But the owners in possession of such lands, who, by reason of the recent circumstances of the Spanish nation, and the revolutions in Europe, have been prevented from fulfilling all the conditions of their grants, shall complete them within the terms limited in the same, respectively, from the date of this treaty; in default of which, the said grants shall be null and void. All grants made since the said 24th of January, 1818, when the first proposal, on the part of His Catholic Majesty, for the cession of the Floridas, was made, are hereby declared, and agreed to be, null and void."

In the light of the Spanish text, to the effect that grants should "remain ratified and confirmed," the treaty has been frequently construed as meaning that grants needing no confirmation should stand confirmed, while those requiring confirmation should receive it in due course as might be provided.

Undoubtedly private rights of property to land lying within the territory ceded were entitled to protection, whether they

were complete and absolute titles, or merely equitable interests needing some further act of the Government to perfect the legal title. The duty of securing such rights belonged to the political department, and might be discharged by Congress itself, or through the instrumentality of boards, or of strictly judicial tribunals. And even grants which were complete at the time of the cession might be required by Congress to have their genuineness and their extent established by proceedings in a particular manner before they could be held valid. *Ainsa* v. *New Mexico & Arizona Railroad,* 175 U. S. 76; *Botiller* v. *Dominguez,* 130 U. S. 238; *United States* v. *Clarke,* 8 Pet. 436; *Glenn* v. *United States,* 13 How. 250.

In *United States* v. *Clarke,* the acts of Congress prior to 1834 were considered by Chief Justice Marshall, in the instance of a complete and perfect grant. Referring to the act of May 26, 1830, the Chief Justice said : " It was obviously the intention of Congress to extend the jurisdiction of the court to all existing claims and to have them finally settled. The purposes for which the act was made could not be otherwise accomplished. . . . The words which confer jurisdiction, and describe the cases on which it may be exercised, are ' all the remaining cases which have been presented according to law, and not finally acted upon.' The subsequent words ' shall be adjudicated,' etc., prescribe the rule by which the jurisdiction previously given shall be exercised." Quoting from the sixth section of the act of May 8, 1822, he said : " The object of this law cannot be doubted. It was to separate private property from the public domain for the double purpose of doing justice to individuals, and enabling Congress safely to sell the vacant lands in their newly acquired territories. To accomplish this object, it was necessary that all claims of every description, should be brought before the commissioners, and that their powers of inquiry should extend to all. Not only has this been done, but, further to stimulate the claimants, the act declares ' that any claim not filed previous to the 31st of May, 1823, shall be deemed and held to be void and of none effect.' This primary intention of Congress is best promoted by determining causes finally, where their substantial merits can be discerned." He further

quoted the sixth section of the act of May 23, 1828, and from the act of May 26, 1824, (referred to in the act of May 26, 1830,) and as to the latter act said that it "does not define the jurisdiction conferred on the court of East Florida by the act of 1830, but directs the mode of proceeding and the rules of decision."

In *Glenn* v. *United States*, Mr. Justice Catron, referring to the case of Arredondo, said: "That proceeding was founded on a perfect title, having every sanction the Spanish government could confer. It was brought before the courts according to the sixth section of the act of May 23, 1828, which embraced perfect titles, and was only applicable to suits in Florida."

The cases of *United States* v. *Arredondo*, 6 Pet. 691; *United States* v. *Percheman*, 7 Pet. 51; *United States* v. *Clarke*, 8 Pet. 436, were all instances of complete and perfect titles brought into court under these statutes.

*Botiller* v. *Dominguez* was a writ of error to the Supreme Court of California to review a judgment in favor of plaintiff in an action in the nature of ejectment. Plaintiff's title was a grant alleged to have been made by Mexico, but no claim under the grant had ever been presented for confirmation to the board of land commissioners appointed under the act of Congress of March 3, 1851, c. 41, 9 Stat. 631; and no patent had ever issued from the United States to any one for the land or any part of it. The state court held that the title to the land by the Mexican grant was perfect at the time California was acquired, and that the grantee was not compelled to submit the same for confirmation to the board of commissioners. This court ruled that no title to lands in California dependent upon Spanish or Mexican grants could be of any validity which had not been submitted to and confirmed by the board provided for that purpose by the act of Congress, or, if rejected by that board, confirmed by the District Court or by the Supreme Court of the United States. Two propositions were urged in support of the decision of the state court. First, that the statute itself was invalid because in conflict with the treaty with Mexico, and also with rights of property under the Constitution and laws of the United States. Second, that the statute was not intended

to apply to claims which were supported by complete and perfect title from the Mexican government, but only to such as were imperfect, inchoate and equitable in their character.   As to the first of these propositions, this court held that so far as the act of Congress was alleged to be in conflict with the treaty with Mexico, that was a matter in which the court was bound to follow the statutory enactments of its own Government.   As to the second point, it was held that the statute applied to perfect as well as imperfect claims, and Mr. Justice Miller, delivering the opinion, said :

"It was equally important to the object which the United States had in the passage of it, that claims under perfect grants from the Mexican government should be established as that imperfect claims should be established or rejected.   The superior force which is attached, in the argument of counsel, to a perfect grant from the Mexican government had its just influence in the board of commissioners, or in the courts to which their decisions could be carried by appeal.   If the title was perfect, it would there be decided by a court of competent jurisdiction, holding that the claim thus presented was valid ; if it was not, then it was the right and the duty of that court to determine whether it was such a claim as the United States was bound to respect, even though it was not perfect as to all the forms and proceedings under which it was derived.   So that the superior value of a perfected Mexican claim had the same influence in a court of justice which is now set up for it in an action where the title is contested.   Nor can it be said that there is anything unjust or oppressive in requiring the owner of a valid claim, in that vast wilderness of lands unclaimed, and unjustly claimed, to present his demand to a tribunal possessing all the elements of judicial functions, with a guarantee of judicial proceedings, so that his title could be established if it was found to be valid, or rejected if it was invalid.   We are unable to see any injustice, any want of constitutional power, or any violation of the treaty, in the means by which the United States undertook to separate the lands in which it held the proprietary interest from those which belonged, either equitably or by a strict legal title, to private persons.   Every person owning land or

other property is at all times liable to be called into a court of justice to contest his title to it. This may be done by another individual, or by the government under which he lives. It is a necessary part of a free government, in which all are equally subject to the laws, that whosoever asserts rights or exercises powers over property may be called before the proper tribunals to sustain them."

We are of opinion that these acts applied and were intended to apply to all claims, whether perfect or imperfect, in that particular resembling the California act; that the courts were bound to accept their provisions; and that there was no want of constitutional power in prescribing reasonable limitations operating to bar claims if the course pointed out were not pursued.

Mrs. Fish naturally took that view and memoralized the commissioners, who reported in favor of the claim, and the report was transmitted to Congress in February, 1826.

The act of May 23, 1828, followed, which confirmed all claims, which had been recommended for confirmation, of which this was one, to the extent of a league square, but provided that the confirmation should not be effectual until all the parties in interest in the original grant had filed a full and final release of all claims to the residue contained in it, with the register and receiver of the district where the grant was situated. We do not agree with the master that the effect of this was to confirm the entire grant, but, on the contrary, we think that by the action of Congress all of the claim except a league square was rejected, and that as there was no release of the excess, the condition of the confirmation failed.

And inasmuch as this was the situation, and claimants had neither accepted the league square nor availed themselves of the legislation providing for resort to the courts, it was held when the matter was litigated in the land department that the claim was barred. The views there entertained were expressed by the Commissioner in his report of August 2, 1890, and by the Secretary of the Interior in his decision of June 22, 1893. 16 Land Dec. 550. The land department was of opinion that even conceding that the claim was a valid grant from the Spanish government for the full quantity of 10,000 acres,

and that the act of May 23, 1828, which governed that, among
other claims, was in violation of the obligations of the treaty,
the department and the courts were bound to follow the statu-
tory enactments of their own government, and must be con-
trolled thereby, and that regarding the claim as coming within
the provisions of the acts of 1827 and 1828, its validity could
not be recognized because the claimants had failed to comply
with the conditions prescribed by these acts. All claims of
every description whatever, whether arising under patents,
grants, concessions or orders of survey, were required to be
submitted to the board of commissioners for confirmation, or to
be submitted to Congress for final action, before their validity
could be recognized, and all claims reported upon by the com-
missioners, whether founded upon a complete or an incomplete
title, were subject to the provisions of the act of Congress of
May 23, 1828, and barred in accordance with its provisions. If
the claim came within the provisions of the second section of
that act, its validity was recognized only to the extent of one
league square, and upon the condition that the claimant should
relinquish all in excess of that quantity on or before May 26,
1831. If it did not come within the provisions of said section,
then it was a claim not acted upon by Congress, and was barred
by failure to commence the proper proceedings in the courts
within the time limited in the sixth section of the act of
May 23, 1828.

We accept these conclusions, and with the less reluctance, as
if this were a perfect title as contended, resort to the courts might
again have been had under the acts of 1860 and 1872.

It seems to us that the Government was unquestionably en-
titled to demand the seasonable assertion of such claims as this,
and that years after the public surveys had been extended over
the land, and the maps and plats thereof approved; many reser-
vations made for public purposes; patents issued; homestead
entries made and final certificates issued; the exhibition of a
bill to set aside the patents of the Government by those who had
failed to comply with the statutes came undeniably too late.

In our judgment the bill cannot be maintained because com-
plainants failed to show complete legal title from the King;

and because the claim was barred by the statutes to which we
have referred.

*Decree reversed and cause remanded with a direction to dis-
miss the bill.*

MR. JUSTICE SHIRAS and MR. JUSTICE PECKHAM dissented.