## Stewart *versus* Trevor.

1. An error in the mode of exercising an acknowledged power in regard to unseated land is an irregularity only.

2. Tax sales of unseated lands are invalid, if they were first assessed as seated and then transferred to the unseated list without notice to the owner.

3. Lands that were once seated may be suffered to fall into their natural state and become unseated, when the property is entirely abandoned and the abandonment is so unlimited in time and evinced by such acts as leave no doubt of the intention.

4. It requires stronger evidence to prove that a house and lot in a town have been abandoned and become unseated, than a tract of land on which there never were improvements or anything more than temporary cultivation.

5. The court charged that the statutory limitation of five years applied only when the property was unseated at the time of assessment; if then seated, the sale was void and the statute inapplicable. *Held* to be correct.

6. The limitation is perfect at the end of five years without regard to possession.

November 19th 1867.  Before THOMPSON, STRONG, READ and AGNEW, JJ.  WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Fayette county :* No. 65, to October and November Term 1867.

This was an action of ejectment, brought October 27th 1865, by John B. Trevor, Sarah A. Trevor and George N. Eckert and Emily T. his wife in her right, against David Springer and Andrew Stewart, for a lot of one quarter of an acre in Uniontown.

The plaintiffs are the children and heirs of John B. Trevor the elder, deceased.  They gave in evidence a sheriff's sale of the property in dispute to the decedent and Alexander McClurg for $900 :—the sheriff's deed was acknowledged March 5th 1830 ;— also the conveyance of McClurg of his interest in the lot to Mr. Trevor, deceased, on the 21st of November 1839.

The defendants gave in evidence the assessment roll for the year 1856: " Trevor and McClurg, N. R. H. & L. val. $200." N. R. means non-resident.

Also, Unseated Land-Book: title, County and State Tax on unseated land in East Ward, " Union borough township," for the year 1856.

" I, Elisha Hiatt, collector of county and state tax in the East

[Stewart *v.* Trevor.]

Ward, Union borough, for the year 1856, do hereby certify that I have not and cannot collect the taxes charged on my duplicate, assessed on the following described unseated land in the borough and year aforesaid. House and lot, Trevor & McClurg, 75 cents county, and 60 state.

"December 30th 1856.          ELISHA HIATT, Collector."

They proved that there had been no separate list of unseated lands in the East Ward; unseated lands are not classed, they are included in the general list of taxable property: the commissioners having nothing by which they can tell whether property in the East Ward is seated or not until the collector makes his return.

They showed also an entry in the treasurer's sale-book:—

"Sales of 1858—Sales of unseated lands sold by Jacob Crow, treasurer, 14th June 1858, for the taxes of the years 1853, 1854, 1855 and 1856, under the head of E. W., Union borough, H. & L. Trevor & McClurg. Amount of taxes charged in each tract, $1.35, Calvin Springer, purchaser. Amount of sale, $5. Amount of tax, with costs, $4.97½. Deed to Calvin Springer by Jacob Crow, treasurer, dated 22d June 1858." And deed from Springer to Stewart, on the 3d of August 1864, for the same land for $175. Springer testified: "At the time I bought it, it was lying vacant; nothing on the lot but the house; there might be a panel of fence on the upper side; one side of the roof off the house, one side of the house near out; it was in this condition several years before the sale; no windows or doors to the house; lower floor principally gone; it had become a waste-house, so dilapidated that it was not fit for occupation; it had not been occupied for three years before I bought it; it was last occupied by Mr. Doran as a carpenter shop; in the spring of 1859 or 1860 a fence was put up around the lot, and it was occupied that year; the house was not occupied till 1861; Doran occupied it as a carpenter shop three or four years before the sale."

They gave other evidence of the condition of the property, of the same character with that of Springer; and also of repairs and improvements made by Springer and Stewart, amounting to $500 or $600, or more.

There had been a former ejectment brought on the 20th of September 1864, by the same plaintiffs, to recover this lot, in which there were a verdict and judgment for the defendants.

In rebuttal the plaintiffs called Springer, who testified: "On the last day of redemption for this sale, Mr. Stewart came to me and said he had a letter from McClurg to redeem that property; I told him all right; he said he would pay me the money, and I should assign the deed to him and he would pay me the money; I told him I would not assign the deed, but would take the money.

[Stewart *v.* Trevor.]

After I refused to sign the deed, we entered into an agreement that we would take the property in partnership; if the party came on and paid us for our improvements, we would give it up or pay them for their interest in it; we went into that arrangement; he was to pay me one-half the money I had expended, and we were to be joint partners; he said McClurg had merely written to him to redeem the property, but sent him no money; he said as I would not assign, his mission was ended."

There was other evidence on both sides as to Stewart's title being in trust for the plaintiffs' ancestor.

The following are the points submitted by the defendants, with the answers of the court:—

" 1. The house and lot having been sold in 1858 for the taxes of 1853, 1854, 1855 and 1856, during all or most of which term it lay vacant without roofs, &c., and nothing in it to make the taxes; and the owner not having paid or tendered the taxes within two years after the sale, the law declares ' that in no other case and in no other plea shall an action be sustained; and that no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.'

" 2. The plaintiffs not having brought their first ejectment until September 20th 1864, more than five years after the sale made in June 1858, were barred by the statute which declares that ' no action for recovery of said land shall lie, unless the same shall be brought within five years after the sale thereof for taxes as aforesaid.'

" 3. If the jury shall find for the plaintiffs, the Act of Assembly declares ' that no law for the sale of land for taxes shall be so construed by any court as to prevent a recovery of the value of the improvements made *in all* cases whatsoever where a recovery is effected against a purchaser at a sale for taxes, or other person claiming under him, but the Act of Assembly shall be so construed that a recovery for improvements as aforesaid shall be an incident in all cases whatsoever where there is a recovery against the tax-title without regard to the nature of the defects in said title,' no defects in the title being known to the purchaser at time of sale, and no tender of redemption-money being made at any time."

Answer : " All the foregoing points are sufficiently answered in the general charge except the 2d, and to the 2d we answer : That although it was believed by many of the profession that the redemptionary right of two years, allowed in the Act of 1815, was a substitute for the Statute of Limitation of five years in the Act of 1804, it is now ruled that the 3d section of the last-named act, and the 13th section of the Act of 1815, must be construed as being *in pari materia*, and limit the right of action in the original

[Stewart v. Trevor.]

owner of unseated land sold for taxes to five years, where posses-sion has been held for five years before the action is brought.

" But this only applies where the property was unseated at the time of the assessment. If it was seated the sale was merely void and the Statute of Limitation mentioned in this act could not apply. If the property on the other hand was unseated at the time of the assessment, and there was a possession for five years before suit brought, the plaintiff's action would be barred."

The court (Gilmore, P. J.) charged :—

* * * " On the 30th December 1856 Elisha Hiatt, collector for the Eastern Ward of Union borough, made this return to the commissioners : ' I do certify that I have not and cannot collect the taxes charged in my duplicate assessed on the following de-scribed lands in the borough and year aforesaid :—H. & lot Trevor & McClurg, 75 cts. co. tax and 60 cts. state tax.' Signed Elisha Hiatt, collector.

" This return, we presume, was made for the purpose of exone-ration, and the same section prohibits the sale of the property so exonerated from sale by the treasurer. But the H. and lot were sold as unseated property for the taxes of this year (1856). There is no separated list of unseated lots in the East Ward of Union borough, but the house and lot was marked (by the commissioners, it is to be presumed) as unseated. The commissioners, if there was no exoneration, might change the character of the assess-ment, but the treasurer could not. Then as there was no evidence that the exoneration had actually been made, and as it is found marked unseated, it, we think, may fairly be presumed to have been changed by the commissioners.

" There are other matters in the case of more important con-sideration. Was this property unseated ? If it was not, the sale is void, and a purchaser claiming title under a treasurer's sale for the payment of taxes is not entitled to recover compensation for the value of his improvements if his title be defeated on the ground that the land was not unseated at the time when the taxes were assessed upon it and for the payment of which it was sold ; and it was so decided on the ground that when the land was seated, there was no jurisdiction, and the sale was absolutely void.

" Even when the taxes had actually been paid on a double assess-ment, or where the land was exempt, there could be a recovery for improvements by the purchaser, the sale being for these rea-sons merely irregular, while the jurisdiction remains on account of the character of the land. The 20th and 21st sections of the Act of 12th April 1842, Pamph. L. 265, was no doubt passed with the view of counteracting the decision of the court in the cases of McKee et al. v. Lamberton et al., 2 W. & S. 107. Indeed we find that when one of the cases was again before the Supreme Court, Larimer v. McCall, 4 W. & S. 133, that these sections of

the Act of 1842 were relied. upon by counsel. But the attempt to interpose the act was rebuked, the court saying that the act could have no bearing upon the case, as it was passed after the judgment had been rendered, and that respect for the legislature forbid them to believe that they ever intended it should apply to such a case.

"But the original intention and object of the law, whatever it may have been, will not prevent its legitimate operation upon subsequent cases of which this is one, if the title of defendants should be defeated on the ground that the house and lot were seated at the time the taxes were assessed in 1856. [The inquiry will then arise under the second proviso of the 20th section of same act, whether the defect in the tax title were known to the purchaser at the time of the sale, and it may be here observed that the vendee of the purchaser having notice, actual or constructive, by ancient improvements which puts him upon inquiry that the land was seated, is not entitled to retain for improvements made by himself.] The first inquiry will therefore be, were this house and lot seated? When land is supposed to remain in its natural state, it is unseated, and the laws authorizing the sale of unseated lands were invariably intended to apply to such; but lands which have been seated may be suffered to fall again into their natural state, and become unseated? When can this be said to happen? · We answer, when the property is entirely abandoned, and this abandonment is so unlimited in time and evinced by such acts as leave no doubt of the intention.

"If you are satisfied there was no such abandonment of the property, the tax title must fail, but if you find otherwise, the plaintiff will be entitled to recover unless for other reasons which have not been mentioned as yet. If the tax·title fails because you are not satisfied that it was unseated at the time of assessment, the defendant will be entitled to recover for improvements made after the two years, unless you are satisfied that he knew the situation of the property in 1856.

"[But if the house and lot were unseated, and the sale is defeated on account ' of an irregularity in the assessment or in the process or otherwise,' then the purchaser or his vendee will be entitled under the 4th section of the Act of the 13th March 1815 to have the value of the improvements made after the sale ascertained and paid by the party recovering, before possession can be obtained. Say, then, that the house and lot were unseated, we say to you that there are such irregularities in the assessment as will defeat the sale. We will mention one which will suffice. This house and lot had been assessed as seated; was so in the year 1856. When changed by the commissioners, there is no evidence that the owner had any notice of the change—this of itself is sufficient to destroy the sale. It is ruled that in such

[Stewart v. Trevor.]

cases notice must be given of the change of assessment, otherwise the sale will not be good or divest the title of the owner.]

" We also think that the 3d section of the Act of 21st April 1856 prohibited the sale of the property at least for the taxes of 1856.

" But in such case and upon such ground affecting merely the regularity of the sale, the defendants would have the right to have the value of their improvements ascertained and paid before possession is delivered."

There was a verdict for the plaintiffs, and the defendants having taken a writ of error, assigned the following errors :—

1. The court erred in not instructing the jury to find for the defendants.

2. The court erred in leaving it to the jury as a question of fact to find whether the lot was seated or unseated.

3. The court erred in quoting and commenting upon the decisions of this court in the cases of McKee v. Lamberton, McCall v. Larimer, and other cases, and then commenting upon the sections of the Act of 12th April 1842, as counteracting those decisions—this course being calculated to confuse and bewilder the minds of the jury.

4. The court erred in assuming throughout the charge that there were certain defects in the title of defendants, and especially in conveying the impression that the lot was seated—and then saying: (as in the part of the charge first enclosed in brackets.)

5. The court gave as a definition of abandonment (such as would turn land once seated into unseated) an extract from the language used in Harbeson v. Jack, 2 Watts 125, Negley v. Breading, 8 Casey 325, without stating the connection in which it was used, or the facts of the cases, which showed why it was used.

6. The court charged (as in the part of the charge secondly enclosed in brackets), and in not affirming the defendants' 1st point.

7 and 8. In not affirming the defendants' 2d and 3d points.

9. In not charging that the defendants were entitled to recover the value of their improvements.

*A. Howell*, for plaintiffs in error, cited McCulloch v. Cowher, 5 W. & S. 427 ; Galbraith v. Elder, 8 Watts 103 ; Forster v. McDivit, 5 W. & S. 360 ; Wilson v. Watterson, 4 Barr 219 ; Act of April 12th 1842, § 20, Pamph. L. 265, Purd. 997, pl. 45 ; Harbeson v. Jack, 9 Watts 125 ; Negley v. Breading, 8 Casey 325 ; Keating v. Williams, 5 Watts 382 ; McKibbon v. Charlton, 2 Harris 128 ; Smith v. McGrew, 4 W. & S. 340 ; Cox v. Grant, 1 Yeates 164 ; Laird v. Hiester, 12 Harris 452 ; Larimer v. McCall, 4 W. & S. 133 ; Commercial Bank v. Woodside, 2 Har-

ris 404; Milliken *v.* Benedict, 8 Barr 169; Arthurs *v.* Smathers, 2 Wright 44; Robb *v.* Bowen, 9 Barr 71; Sheik *v.* McElroy, 8 Harris 31; Burd *v.* Patterson, 10 Id. 219; Ash *v.* Ashton, 3 W. & S. 513; Acts of March 13th 1815, § 4, 6 Sm. L. 301; March 29th 1824, § 4, 8 Id. 291, Purd. 995, 996, pl. 35, 39.

*D. Kaine*, for defendants in error, cited Rosenburger *v.* Schull, 7 Watts 390; Bank *v.* Woodside, 2 Harris 409; Irwin *v.* Trego, 10 Harris 368; Huzzard *v.* Trego, 11 Casey 9.

The opinion of the court was delivered, January 7th 1868, by

STRONG, J.—The defendants in the court below rested their defence upon a tax title derived from a treasurer's sale in June 1858, for the taxes of the years 1853, 1854, 1855 and 1856. The property sold had been seated. It was a house and lot in the borough of Union, and it had been occupied for years, and down to 1853 or 1854, when it ceased to be inhabited. It was assessed to Trevor & McClurg the owners as seated, during all the years from 1841 to 1858 inclusive, but after the year 1853, as already noticed, it was unoccupied, the house became dilapidated, and the fences were destroyed. On the 30th of December 1856, the collector of taxes made the following certificate: " I, Elisha Hiatt, collector of county and state tax in the East Ward Union borough for the year 1856, do hereby certify that I have not and cannot collect the taxes charged on my duplicate, assessed on the following described unseated land in the borough and year aforesaid :— house and lot, Trevor and McClurg, 75 cents county, and 60 state, Elisha Hiatt collector." This certificate was doubtless made for the purpose of procuring exoneration. It appears in a book called " Unseated Land Book," under the title " County and State Tax on Unseated Land in East Ward, Union borough township, for the year 1856." How it came there, and whether it was put there as a transfer of the land from the seated to the unseated list, is not shown; nor does it appear that there was any exoneration of the collector, or that by any action of the commissioners the taxes for the years 1853, 1854 and 1855 ceased to be a personal charge against Trevor and McClurg the owners, and became simply a charge upon the land. In regard to all this the record is silent. But the land was sold as unseated in the month of June 1858, and the defendants claim under the sale.

On the trial it seems to have been assumed that the land was transferred from the seated to the unseated list, and the case was put to the jury in two aspects: the first exhibited it as it would be if the land was not unseated when the assessment was made; the second regarded it as affected by alleged irregularities in the assessment itself. We shall first attend to the errors assigned relative to the second aspect of the case. The court instructed

[Stewart v. Trevor.]

the jury, in substance, that if they found the land was unseated, there were such irregularities in the assessment as would defeat the sale. Of these two were mentioned. Said the judge, "This house and lot had been assessed as seated; was so in 1856. When changed by the commissioners, there is no evidence that the owner had any notice of the change. This, of itself, is sufficient to destroy the sale. It is ruled that in such cases notice must be given of the change of assessment, otherwise the sale will not be good or divest the title of the owner." To this the court added, that in their opinion the 3d section of the Act of April 21st 1856 prohibited the sale of the property at least for the taxes of 1856; but they instructed the jury " that in such case, and upon such ground affecting merely the regularity of the sale, the defendants would have the right to have the value of their improvements ascertained and paid before possession is delivered." It is contended, that there was error in so much of this as declared that the sale was void, because notice of the transfer from the seated to the unseated list was not given to the owner. And speaking for myself, I find it difficult to see how such a transfer, one without notice, can be regarded as a perfect nullity, furnishing no authority for a sale. Even of seated lands notice is not essential to the validity of an assessment, though it creates a personal charge, and a transfer from a seated to an unseated list, without notice, would seem to be at most no more than an irregularity. The power to transfer is undeniable. The error, therefore, if any, is in the mode of exercising an acknowledged power, and that is irregularity.

But the Act of March 15th 1815, declares expressly " that no irregularity in the assessment, or in the process, or otherwise shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." It goes further—it enacts, that only when the owner or owners of lands sold for taxes shall have paid the taxes due on them previously to the sale, or within two years thereafter, shall have tendered the amount of the taxes and costs, with 25 per cent. additional, and the tender has been refused, shall he or they be entitled to recover the lands by due course of law," and that in no other case, and on no other plea, shall an action be sustained." Yet, notwithstanding the broad language of the statute, it has been decided in several cases that tax sales of unseated lands are invalid, if the lands were first assessed as seated, and then transferred to an unseated list without notice to the owner. In the earliest of these cases there were some peculiar circumstances, and if they stood alone they might be regarded as exceptional; but a brief review of the course of decision will make it manifest, that the law, as now declared, was in this respect correctly laid down by the court below. The first was Owen v. Vanhook, 3 Watts 260. There, it appeared

that a house and lot had been assessed in 1815 as seated, and a duplicate had been placed in the hands of a collector. There was some evidence that the lot was vacant and unimproved in that year. It was sold at treasurer's sale in 1822 for the tax of 1815. On the trial the duplicate was in evidence, and an undated paper in which the collector made a statement of delinquents from whom he could not collect the taxes charged to them. Among the delinquents was the owner of the house and lot to whom it had been assessed. It did not appear that the commissioners acted on this paper, or exonerated the collector, nor was there any evidence that the lot was inserted in the list of unseated lands. On this state of facts, bearing considerable resemblance to those of the present case, the tax-title was held invalid for two reasons, as given by Judge Huston. The first was that the land did not appear to have been sold as unseated, it not having been assessed as such, or appearing to have been taxed as such. The second was that the transfer from one list to the other, if any there had been, was made after a purchase of the land from the owner, without notice to the purchaser. It was thought that to allow such a change after a purchaser had paid his money would be unjust to him. It was in this case that the doctrine began dimly to appear. Later cases go much further. The next is Lorimer *v.* McCall, 4 W. & S. 133. But even it does not go the length of cases still later, especially if the facts be considered. An entire tract of land had been assessed as seated by the county commissioners, the only competent authority after it had been valued by the township assessors. Subsequently a township supervisor and the assessor having in their hands the duplicate of the assessment made by the commissioners, on the representation of a person in possession of part of the tract, not the owner of the whole, undertook to change the assessment, so as to make 200 acres assessed as seated, and the remaining 239 acres assessed as unseated, without, so far as it appeared, submitting their action to the commissioners. A sale of the land as unseated founded upon that changed assessment, was ruled to be illegal, tending to fraud upon the owner. In the opinion of the court, it was said by Rogers, J., "that even admitting the assessor made return to the commissioners, before the character of the tract could be changed, it would require an express adjudication by competent authority after notice."

Here, then, we have it distinctly avowed that notice to the owner is essential to the validity of a transfer from a seated to an unseated list.

But Milliken *v.* Benedict, 8 Barr 169, settles the matter. After reviewing Lorimer *v.* McCall, and Harper *v.* Mechanics' Bank, 7 W. & S. 214, it does decide broadly and unqualifiedly that an

[Stewart v. Trevor.]

unseated tract, if assessed as seated, cannot be transferred to the unseated list, so as to make it liable to taxation and sale as unseated, without reasonable notice to the owner. This case rests on no peculiar circumstances. It was followed by Commercial Bank v. Woodside, 2 Harris 404, in which the preceding cases were reviewed, and the doctrine of Milliken v. Benedict was reasserted. Thus stood the decision until Laird v. Hiester, 12 Harris 452, in which it was said by Lowrie, J., in substance, " that the forms in which assessments of unseated lands are made are mere matters of official practice, entirely at the discretion of the commissioners of the several counties, subject only to the condition of being intelligible; that the principle was overlooked in 3 Watts 260; and that the authority of the treasurer to sell unseated lands depends upon the facts that the land was unseated at the time of the assessment, that a tax appears to have been, and was assessed upon it by the proper officers, and that the tax has been due for one whole year, and remains unpaid." This authority, it was added, has been restricted by construction in some instances for the protection of innocent persons who, relying upon the customary forms of taxation, may have been led into the mistaken supposition that there was no tax charged upon the land, but only against the owner personally, and reference was made to the cases above noticed.

Precisely how far the court intended to go it may be difficult to say. Surely it cannot be that the court intended to rule that lands need not be taxed as unseated in order to warrant a treasurer's sale of them as unseated. At all events, there is nothing in the case that manifests an intention to question the doctrine asserted in Milliken v. Benedict and Commercial Bank v. Woodside. On the contrary, those cases are recognised. It has sometimes been supposed that the generalizations stated in Hiester v. Laird conflict with the preceding cases, and perhaps they do in some respects, but they do not assert that transfers may be made from a seated to an unseated list without notice.

The last case bearing on the subject is Arthur v. Smathers, 2 Wright 40, and there nothing was decided in regard to it. It was a case of the sale of unseated lands under the Act of 29th April 1844. The question we are now considering was not raised by any assignment of error, and though our brother Thompson expressed the opinion that Laird v. Hiester and an unreported case, confined the operation of Milliken v. Benedict and the other decisions referred to, to cases where the land had been placed on the seated list by arrangement with the owner, he expressly disavowed any purpose to disturb them. It is evident, therefore, after a review of the cases, that they do establish the doctrine laid down by the learned judge of the Common Pleas, that the transfer of the house and lot in controversy, from the seated to

the unseated list without notice to the owner, if a transfer was ever made, was without authority, and that consequently the sale was fatally irregular, or rather was void. This disposes of the 6th assignment of error, and it is all that need be said of the manner in which the case was submitted to the jury on the hypothesis that the land was unseated.

We pass now to the other view. The court charged the jury that while the laws authorizing the sale of unseated lands for taxes apply only to lands which are unseated, those that were once seated may be suffered to fall into their natural state and become unseated, and that this happens when the property is entirely abandoned, and the abandonment is so unlimited in time and evinced by such acts as leave no doubt of the intention. The jury was then directed to find from the evidence whether there had been such an abandonment, with the instruction that, if there had not been, the tax-title must fail, but that even then the defendant was entitled to recover for improvements made after the two years, unless the jury was satisfied he knew the situation of the property in 1856. In this, the defendants now complain, two errors were committed—first, in giving an incorrect definition of that abandonment which changes land once seated into unseated ; and, secondly, in submitting at all to the jury whether there had been an abandonment, instead of deciding as a conclusion of law that the land was unseated. The definition given by the court is precisely that which was given in Harbeson *v.* Jack, 3 Watts 125, and Negley *v.* Breading, 8 Casey 325, and it was accurate. It must require stronger evidence to prove that a house and lot in a town have been abandoned and become unseated, than is required to show an abandonment of a tract of land on which there were never improvements, never anything more than temporary cultivation. Certainly in the former case the evidence should leave no reasonable doubt of an intention of the owner to permit the property to return to a state of nature.

In regard to the other objection, it is enough to say, the court was not asked to decide as a legal conclusion that the lot was unseated. And it would have been improper had such a decision been made. It may be there are cases in which it becomes the duty of the court to determine the fact of abandonment as a matter of law. But such cases are rare, and this is not one of them. Here the assessment was made in 1856, and the building on the lot, a brick building, was occupied until within two or three years of the assessment. The building was not removed. It remained, though in a decaying condition, and nothing but want of a tenant and neglect to repair during the short time mentioned, indicated any intention of abandonment of the property to a state of nature. Not only were the facts to be found in the testimony of witnesses, but the intention of the owner was to be deduced

[Stewart *v.* Trevor.]

from those facts. It was eminently a question for the jury. We have nothing more to say respecting the 2d and 5th assignments of error. The 3d and 4th require no notice; they are unfounded.

We pass now to the consideration of the 7th assignment. The court was requested to charge the jury, " that the plaintiff not having brought their first ejectment until September 20th 1864, more than five years after the sale, were barred by the statute which declares that no action for the recovery of said land shall lie, unless the same shall be brought within five years after the sale thereof for taxes as aforesaid." In their answer to this, the court recognised the statutory limitation. They charged, however, that it applied only when the property was unseated at the time of the assessment; that if it was seated the sale was merely void (as distinguished from irregular); and that the Statute of Limitations was inapplicable. If, on the other hand, the property was unseated at the time of the assessment, " and there was a possession for five years before suit brought, the plaintiff's action would be barred." So far as the answer relates to the effect of the statutory limitation upon actions brought to recover lands that were seated when the assessment was made, it is correct. The subject of the Act of Assembly is unseated land. The assessments spoken of, the sales, the redemptions, the actions for the recovery of lands, whether brought by the purchaser at a sale or by the owner, and the limitations to such actions—have reference to unseated lands and to no other. It was, therefore, right to say, that if the land for which the ejectment was brought was seated at the time of the assessment, the limitation prescribed in the statute has no applicability to the action.

But the court was not as accurate in stating what the law of the case would be, if the land was unseated at the time of the assessment. Since the Act of March 29th 1844, Pamph. L. 168, the limitation is perfect at the end of five years from the delivery of the deed to the purchaser without regard to possession: Robb *v.* Bowen, 9 Barr 71; Sheik *v.* McElroy, 8 Harris 25; Burd's Executors *v.* Patterson, 10 Harris 219. This part of the charge, therefore, was erroneous, and the error would be fatal to the judgment, were it not plain that it did not affect the verdict.

There was a general verdict for the plaintiff, without any valuation for improvements made by the defendants, of which there was considerable proof. Such a verdict, under the instruction of the court, could have been returned only on the finding that the house and lot were seated when the assessment was made, and that the defendants knew at the time of the sale that the property was seated. The charge was that if the land was unseated, the defendants were entitled to have the value of the improvements ascertained and paid. The verdict therefore establishes, that the

6 P. F. SMITH—25

[Stewart *v.* Trevor.]

land was seated, and of course what was erroneously said in regard to the limitation of actions for unseated land was immaterial and harmless.    Of the 8th assignment it suffices to say, that the defendant's 3d point was in fact affirmed in the general charge, so far as it has any applicability to the case.    Of the 9th we remark, if the land was unseated as the jury found it, and if the defendants knew it was so at the time of sale, as the jury also found, the 2d proviso of the Act of Assembly of April 12th 1842, Pamph. L. 265, denies any allowance for improvements.

Nothing remains but the complaint in the 1st assignment, that the court did not direct a verdict for the defendants.    This rests on the assumption that the plaintiffs had no title at the commencement of the action—an assumption entirely unwarranted.    A moiety of the property was acquired by the ancestor of the plaintiffs in 1834, and the other moiety in 1839.    There is nothing to show that the estate thus vested ever passed out of the said ancestor into McClurg.    He may have had some equity, but the legal estate remained in Trevor until his death, and then descended to the plaintiffs, his heirs.    It is not asserted that the descent was not cast before the suit was brought.

Judgment affirmed.