(33 South. 634.)

No. 14,231.

ASHLEY CO., Limited, v. BRADFORD et al.*

(Dec. 1, 1902.)

TAX TITLE—SUIT TO QUIET—FILING ANSWER — ASSESSMENT — HOLDERS OF TITLE — TAX SALE—SETTING ASIDE—PRESCRIPTION—CONSTITUTIONAL LAW.

1. When suits are brought to quiet tax titles under the third section of Act No. 101 of 1898, the answer of defendant, contesting the title, is not too late if filed after the 10 days named but before default. Aliter, as to suits filed under the first section of the act. In such case

*Rehearing denied February 16, 1903.

109 LA.—21

the contest is required to be presented within six months of the time of service of the notice.

2. An assessment of property predicated upon a tax title of record, prima facie valid, is not without legal effect, even though the title itself be void for latent defects. The law prescribes it to be the duty of tax assessor to examine the records in listing property and to assess same in the name of the holders of the legal or record titles. Nor is the assessor made the judge of the validity of such titles.

3. And if the property be sold for the payment of taxes predicated upon such assessment, a valid title may be acquired. It is certainly such a title as the second clause of article 233 of the Constitution intended to protect, after three years, from all assaults except as therein set forth.

4. While constructive or civil possession, as contradistinguished from corporeal, may not suffice for the prescription by which the ownership of property is aided or acquired, it is, when there is no actual or corporeal possession by the tax debtor, considered a sufficient foundation to support the inhibition established by the Constitution, viz:—that no sale of property for taxes shall be set aside for any cause, except that of dual assessment, or the antecedent payment of taxes, unless the proceeding to annul is instituted within three years of the adoption of the Constitution.

5. By article 233 the people of the state, acting through the convention which framed the Constitution, meant to provide a prescription or peremption which would operate to quiet tax titles and thereby settle the ownership of property acquired through them.

6. As a statute of limitation it was intended to have a more far-reaching effect than what Act No. 105 of 1874 has been allowed by the courts to have.

7. Nor is it amenable to the charge of authorizing the taking of property without due process of law.

Nicholls, C. J., dissenting.

(Syllabus by the Court.)

Case certified from Court of Appeals, Second circuit.

Action by the Ashley Company, Limited, against David Bradford and others. Judgment for defendants, and plaintiff appeals. Certified by the Court of Appeals for instructions. Reversed.

William M. Murphy (Farrar, Jonas & Kruttschnitt, of counsel), for plaintiff. A. L. Slack (Edwin T. Merrick, of counsel), for defendants. Hudson, Potts & Bernstein, amici curiæ, for board of commissioners Tensas Basin levee district. J. M. Kennedy, amicus curiæ, for board of commissioners Fifth Louisiana levee district. Foster, Milling, Godchaux & Sanders, amici curiæ.

BLANCHARD, J. Article 101 of the Constitution prescribes that when the Judges of the Courts of Appeals certify to this court a question or proposition of law arising in a cause pending before them, concerning which they desire instruction for its proper decision, this court may either give the instruction applied for, or may cause the record of the case to be sent up for its consideration, to the end of determining the whole matter in controversy the same as though the case was on appeal directly here.

In certifying the propositions of law arising in the instant case, the Judges of the Court of Appeals have, ex proprio motu, transmitted thither the whole record, so that the case is here for such action as the court may see proper to take—whether to give, merely, the instructions applied for, or decide the case outright.

We will do the latter, though our doing so in this instance is not to be deemed and taken as a precedent.

The case calls for the construction of the second clause of article 233 of the Constitution. The question at issue is considered of vast importance, affecting, even, public policy, and involving large interests throughout the state.

That great interest is taken in the case by the profession is attested by the fact that prominent lawyers, having no direct connection with it, have, as amici curiæ, filed briefs, some on one side, some on the other. There are no less than four of these, besides the briefs of regular counsel and those of special counsel employed on each side. The importance of the case results from the question at issue—the precedent to be set—not from the amount or value at stake.

In 1856 Dr. C. J. Mitchell entered at the State Land Office a tract of land of some hundreds of acres. It was wild land covered with forests, in the swamps of the Mississippi river, subject to overflow. Its location was the parish of Madison.

A portion of the land so entered was the N. ½ of N. W. ¼ of section 30, T. 15 N., R. 11 E., containing 80 and a fraction acres, and over this 80 acres the present legal warfare is waged.

, The land so entered by Mitchell became known on the land maps and plats of the parish as the "Mitchell Tract."

At the time of this entry Mitchell resided in Madison parish. He continued to reside there until 1862. After the Civil War he removed to and settled in the city of Vicksburg. He died in 1886.

It is doubtful if Dr. Mitchell ever paid any taxes on the land after he acquired it. Certain it is he paid no taxes after his removal from the state in 1867 to the time of his death in 1886—a period of nearly 20 years.

The tract of land does not appear to have been assessed to him at all up to the date of his death.

After his death it went on the assessment rolls for the year 1887 under an assessment to the succession of C. J. Mitchell. This was its first appearance on the assessment rolls—certainly since the close of the Civil War.

Since 1887 to the present time it has been regularly assessed to the Mitchells (the dead man's widow and heirs) or their transferee, Bradford (defendant herein), and they have paid the taxes under these assessments, which included the 80 acres involved herein.

Adjoining the Mitchell tract is another and larger tract of land known on the maps as "Ararat." One Milford Hunter was the owner of "Ararat." He acquired it partly by entry at the State Land Office prior to the Civil War, and partly by purchase from others who had entered portions of the tract.

The 80 acres of the Mitchell tract which figure in this controversy are immediately adjacent to—touch, connect, join—the western portion of the "Ararat" tract.

While no return of the Mitchell tract was made for taxation and the same was omitted from the rolls, the "Ararat" tract was, in 1870, assessed to M. A. Hunter, and continued to be assessed each year thereafter, until and inclusive of 1877, in his name.

Whether "M. A. Hunter" was the Milford Hunter who became the owner of the tract as above stated, or was another and different man, is not made clear.

In assessing the "Ararat" tract to M. A. Hunter, the assessor included in the description the N. ½ of N. W. ¼ of S. 30, T. 15, N., R. 11 E. This was 80 acres appertaining to the Mitchell tract adjoining—no portion of which tract, as heretofore explained, appearing at any time on the rolls as assessed to Mitchell. This inclusion of the 80 acres of the Mitchell tract in the assessment of the

"Ararat" tract, made to Hunter, continued to and inclusive of the year 1877.

Hunter failed to pay the taxes under the assessment thus made to him, and on the 1st of August, 1874, the tax collector exposed the property for sale by a description (the same as on the assessment rolls) which included specifically the N. ½ of the N. W. ¼ of Sec. 30, T. 15, R. 11. In default of bidders the property was adjudicated to the state and title to the state therefor, dated March 15, 1875, was recorded in the conveyance records on April 5, 1875.

The sheriff's title to the state shows the property was sold for the payment of taxes assessed against Hunter for the years 1869, 1870, 1871 and 1872.

In 1881 the sheriff and tax collector prepared and advertised a descriptive list, giving names of parties to whom assessed and description of each piece separately and amount of taxes due thereon, of all property situated in the parish forfeited or sold to the state for delinquent taxes and not redeemed as provided by law, and announced the sale of the same for the taxes due thereon pursuant to Act No. 107 of 1880. This offering took place first in March, 1881, and there being no bid, again in May, 1881, and at the last offering all the property assessed in the name of Hunter, including the 80 acres in question, was adjudicated to John B. Stone.

The sheriff's deed recites that the property was sold for delinquent taxes due for the years from 1870 to 1877, both inclusive, and that each piece of property sold was offered separately by description and name of party to whom assessed.

Stone paid the amount of his bid and also the taxes on the property for 1880 (then due) and recorded his title in the conveyance records on August 27, 1881.

Thereafter the property, including the 80 acres, was assessed to him and he paid the taxes thereon for the years 1881 and 1882. He failed to pay the taxes for 1883, 1884 and 1885 and the property was offered for sale by the tax collector for those taxes, and in default of any bid therefor was adjudicated to the state.

This was in May, 1886. The state's title was recorded in the conveyance records July 15, 1886.

In November of the following year the State Auditor, acting under Act No. 44 of the Acts of 1886, certified the lands to the board of commissioners of the Fifth levee district, and the levee board's title was recorded in the conveyance records on December 28, 1887.

The description in all these transfers included, specifically, by legal subdivision, the 80 acres involved in this suit.

The levee board sold to James A. Stone in March, 1889; Stone sold to William Gerton in April, 1889; Gerton, later in the same month, sold to Silas F. Catchings; and Catchings in May, 1889, sold to the plaintiff company.

All these acts of sale were seasonably recorded in the conveyance records.

The land, including the 80 acres, has been steadily assessed to the plaintiff company since its acquisition in 1889 and it has paid the taxes.

There is an admission in the record that the "Mitchell" and "Ararat" tracts are situated in that part of the parish of Madison known as "abandoned or wild lands" and that there has been no tangible possession of the same or any part thereof by any one since 1865.

If there ever was any other than civil or constructive possession of either tract at any time by any one it is not shown.

The records of the parish do not disclose any conveyance of the Mitchell tract, or any part of it, by the Mitchells to any one until 1897, when they sold the tract to Bradford, one of defendants, who is the brother of Mrs. Mitchell.

There is an admission of record that neither Bradford, nor the Mitchells, received any notice from the tax collector, or had knowledge of the adverse claim set up to the 80 acres until the early part of 1901; and that plaintiff and the defendants have, each, paid taxes upon the 80 acres, separately listed, without being aware of the adverse pretentions of each other.

It is also admitted that Jno. B. Stone, who bought at tax sale in 1881, knew nothing of the title or claim of the Mitchells to the 80 acres. The same is true of those who acquired subsequently to Stone and antecedently to plaintiff company.

There is nothing to show that the latter had any knowledge of the adverse claim of the Mitchells prior to or at the time of its purchase in 1889.

In the latter part of May, 1901, more than three years subsequent to the adoption of the Constitution of 1898, the Ashley Company brought this suit, alleging its ownership of the N. ½ of the N. W. ¼ of S. 30, T. 15 N., R. 11 E. (the 80 acres in question). It set forth its chain of title as hereinbefore given. It represented that David Bradford and the heirs of C. J. Mitchell (naming them) claimed to own the property, though it (the petitioner) and its assignors had been in possession of same as owners since May, 1881, when Jno. B. Stone acquired it at tax sale.

It averred that, desiring to avail itself of the provisions of the Constitution and laws, it had brought this suit as a means of giving notice to each and all of the adverse claimants that unless they instituted proceedings to annul the tax sales and titles, through which petitioner held the property, within 10 days from the service of the petition, it (the company) would seek confirmation of its title.

The prayer of the petition was for judgment confirming and quieting its title.

The action is predicated upon the second clause of article 233 of the Constitution of 1898, and the third section of Act No. 101 of the Acts of 1898.

The clause of the Constitution referred to is as follows:—

"No sale of property for taxes shall be set aside for any cause, except on proof of dual assessment, or of payment of the taxes for which the property was sold prior to the date of sale, unless the proceeding to annul is instituted within six months from service of notice of sale, which notice shall not be served until the time of redemption has expired, or within three years from the adoption of this Constitution, as to sales already made, and within three years from the date of recordation of the tax deed, as to sales made hereafter, if no notice is given. The manner of notice and form of proceeding to quiet tax titles shall be provided by law."

The General Assembly followed with Act No. 101 of 1898, the title of which is

"An act to provide a manner of notice and form of proceeding to quiet tax titles in accordance with article 233 of the Constitution."

The first section of this act recites that a tax purchaser may institute suit by petition and citation, as in ordinary actions, against the former owner of the property, giving notice of his title, how obtained, etc., and that the title thus held by him will be confirmed unless a proceeding to annul is instituted within six months from date of service of the petition and citation. If no proceeding is instituted within six months to annul the sale it is required that judgment be rendered quieting and confirming the title.

Another section (the third) provides that in all cases where tax titles have been quieted by prescription of three years, as set out in article 233 of the Constitution, the tax purchaser may, if he so desire, obtain a judgment of the court confirming his title, the same to be done by suit in the manner and form as set out in section 1, except that the delay for answer shall be ten days instead of six months.

The plaintiff having cited defendants under the last-mentioned clause of the act of 1898, and defendants having filed their answer after 10 days from service of citation but before default was taken, the point is made by plaintiff that the answer comes too late; that the statute limits to ten days fixed, from and after the date of service, the filing of the answer.

We do not assent to this. The statute itself assimilates suits of this character to ordinary actions. We think the ordinary rules of practice should obtain, at least with regard to the delay to answer given by the third section of the act. That is to say, the defendant may withhold his answer until default is regularly taken. As to the longer delay—that of six months—stipulated in the first section, the language of the act seems mandatory, thus:—

"After the lapse of six months from service of petition and citation, if no proceeding to annul the sale has been instituted, judgment shall be rendered quieting and confirming the title."

Defendant's answer is timely.

Of the defenses set up by way of exception and answer, we do not find that dual

assessment of the property for the years for the payment of whose taxes it was sold is averred; nor do we find any allegation of payment of the taxes for which the property was sold prior to the date of the sale.

· No sale of property for taxes shall be set aside for any cause (except on· proof of dual assessment, or payment of the taxes for which the property was sold prior to the date of the sale) unless the proceeding to annul is instituted within three years from the adoption of this Constitution as to sales already made—is the mandate of the organic law.

Defendants seek to avoid the effect of this by the contention, elaborated in their answer, that when the 80 acres in controversy was assessed in 1870 and the following years to M. A. Hunter, the latter was not the owner of the same, and that the listing of their property to him was an absolute nullity, as was also the sale of the property, under that assessment, which followed. They insist that this was not such a sale as was contemplated by the framers of the Constitution when they ordained that no sale of property for taxes shall be set aside for any cause except dual assessment or antecedent payment of taxes, and that if it were, the provision of the state's organic law authorizing the same contravenes the Federal Constitution in that it operates to divest them of their property without due process of law.

Into these propositions may be condensed the whole defense set up.

It will be recalled, from the statement of facts hereinbefore made, that when, in default of other bidders, the property was adjudicated to the state at the tax sale made in 1874, such title as was passed remained in the state until 1881, and that, then, under a statute of that period authorizing property that had been forfeited to the state for nonpayment of taxes to be sold for such taxes and those subsequently accruing, it was again offered, and at this second sale John B. Stone became the purchaser. The sheriff made title to Stone and it was placed of record.

This registry of the tax deed to Stone had the effect, at least, of investing him with "color of right." Dillingham v. Brown, 38 Ala. 313; Rivers v. Thompson, 43 Ala. 641; Finlay v. Cook, 54 Barb. 23; Pleasants v.

Scott, 21 Ark. 374, 76 Am. Dec. 403; Chapman v. Templeton, 53 Mo. 463.

He was the record owner. It could be said of his title that it was "deduced of record." The law made it prima facie valid, with the right of immediate possession. Act No. 107 of 1880. The fictitious legal seisin which the law makes the accompaniment of completed act of sale flows from a tax adjudication. Handlin v. Lumber Co., 47 La. Ann. 401, 16 South. 955.

The law prescribed it to be the duty of the tax assessor to examine the records in making up his assessment rolls, in listing property to the owners thereof, and to assess same in the names of the holders of the legal or record titles.

This, the assessor did in this instance. Nor was he made the judge of the validity of Stone's title. Following Stone's purchase the property was assessed in his name and he paid the taxes for two years. This assessment was not void. The law gives effect to it, and when, after two years, Stone failed to pay taxes, and the property was sold by the tax collector, a valid title could be acquired at such sale. Cooley on Tax. (2d Ed.) p. 567, and authorities cited in note; Prescott v. Payne, 44 La. Ann. 650, 11 South. 140; Augusti v. Citizens' Bank of Louisiana, 46 La. Ann. 529, 15 South. 74;· Michel v. Stream, 48 La. Ann. 341, 19 South. 215; Marti v. Wall, 51 La. Ann. 953, 26 South. 44; Adolph v. Richardson, 52 La. Ann. 1158 et seq., 27 South. 665.

This is the title which the plaintiff, through mesne conveyances, holds. It is such a title as the constitutional provision (even if it went no further) undoubtedly intended to protect, after three years, from all assaults except those founded on dual assessment, or the antecedent payment of the taxes for which the property was sold.

This is so unless it be that the prescription of the Constitution does not apply otherwise than in cases where the tax purchaser takes and holds for the prescriptible period the actual, corporeal possession of the property.

And this brings us to the consideration of that important question.

Tax purchasers may be divided into three classes. Cooley on Taxation (2d Ed.) p. 557

(1) Those who take actual, corporeal pos-

session of the property under and by virtue of the tax collector's title.

(2) Those who buy property not tangibly but only constructively in the possession of the tax debtor, and, themselves, obtain no other possession than the civil or constructive possession which follows the tax collector's title to them and its registry in the conveyance records.

(3) Those who buy property which is tangibly and corporeally in the possession of the tax debtor, but who content themselves with merely accepting and recording the tax collector's title, making no effort to dispossess the original owner.

This court had occasion in Canter v. Heirs of Peter Williams, 107 La. 77, 31 South. 627, to consider the case of a tax purchaser coming under the first class, and experienced no difficulty in applying, to the protection of the rights he claimed, the constitutional prescription of three years.

It was there held that the provision of the Constitution was intended to have the effect of a statute of repose, and that, in case of the sale of property for taxes prior to the adoption of the Constitution, after the lapse of three years from such adoption, the party in possession under his tax title, which had been duly recorded, cannot be disturbed except on the charge and proof of dual assessment of the property, or of the payment of taxes for which the property was sold prior to the date of the sale.

The present suit brings squarely before the court the case of a tax purchaser coming under the second class.

The defendants herein, original owners, never had any actual or corporeal possession of the land in dispute. It was wild, unoccupied territory. They had only constructive, or civil possession, springing from their title of record. And it is straining a point to put them in the position of owners with even constructive possession, for it is a fact that they removed from the state, left no agent, practically abandoned the land, ceased to look after it, and for nearly 20 years neither returned it for assessment nor paid or offered to pay taxes on it.

More than this, while an adverse title to the land appeared on the public records as early as 1875, preceded by public advertisement of the same for sale for taxes, and other adverse titles, predicated on the first, appeared on the records in subsequent years—including a forfeiture of the property to the state for nonpayment of taxes, which forfeiture continued for 6 years—it was not until as late as the year 1901 (as claimed by themselves) that they had knowledge of said adverse claims.

This is but cumulative evidence of the neglect of the land by the owners and their indifference as to its fate.

Nor does the fact that in 1887, about 20 years after the removal of the owners from the state, they began to look after the land and to pay taxes on it, greatly relieve the situation as to them.

At that time the adverse title against which they are now contending had been of record more than 10 years, and under it the present plaintiff and the authors of his title had been paying taxes, and have continued to pay them ever since.

And what further serves to weaken what little claim to consideration they have is the fact that in 1898 the present Constitution of the state was adopted, with its article 233 giving notice and warning to all landholders, who had been neglectful of their duty in respect to payment of taxes on their holdings, that after three years from the adoption of the Constitution no sale for taxes would be permitted to be set aside for any cause, except on proof of dual assessment, or antecedent payment of taxes.

After this notice it behooved these defendants, who knew they had paid no taxes for 20 years prior to 1887, to look into the situation of their property with respect to its forfeiture or sale for back taxes. Had they done so, they could have discovered the adverse title now set up, and discovering it, and warned by the Constitution they must institute proceedings to annul within three years, they would, had they been alive to their rights, have timely filed such a proceeding.

As it is they slept on their rights, they permitted the three years to elapse without action; and now they are cut off from any defense against the adverse title save the two the Constitution permits to be urged after the lapse of the three years, unless the want of actual possession of the property by those holding the adverse title makes the con-

stitutional prescription or peremption inapplicable. ·

Does it—is the question presented and on which the case turns?

The constitutional provision under consideration does not seek to validate void or voidable tax titles. It does not merely prescribe a time within which a bad title may ripen into a good one. It does not establish a rule of property. Its object and effect is to bar by limitation the owner's remedy, if the time be suffered to elapse without suit. It bars all grounds or causes of action for setting aside the tax title save the two excepted from the operation of the provision. The constitutional provision takes nothing away—neither the right nor the remedy. It merely limits the time within which the original owner must present his claim. It really affirms the existence of a remedy, but limits its operation. The negligent owner is cut off by limitation because he failed to prosecute the remedy limited.

Such laws are enacted under the sovereign power of the state to limit within reasonable bounds the time for which its courts shall remain open for the adjustment of controversies, and when the time is not unreasonably short they are grounded in sound policy. Cooley on Taxation (2d Ed.) p. 556; Blackwell on Tax Titles (4th Ed.) p. 643 et seq.

Many states of the Union have statutes of similar import, and the limit of three years has been maintained by the courts as a sufficient time—a time not unreasonably short. So, too, has the general power in state legislatures to enact such statutes of limitation been maintained by the courts of the highest authority. Barrett v. Holmes, 102 U. S. 651, 26 L. Ed. 291; Wheeler v. Jackson, 137 U. S. 246, 11 Sup. Ct. 76, 34 L. Ed. 659; Mitchell v. Furman, 180 U. S. 402, 21 Sup. Ct. 430, 45 L. Ed. 596; Terry v. Anderson, 95 U. S. 628, 24 L. Ed. 365.

The plaintiff herein has never, it is true, taken actual, corporeal possession of the property. He has not occupied it. Neither did those under whom he claims occupy it.

Whatever possession he or they had, or have, sprang from recorded tax titles. The law recognizes possession as following the registry of title without any actual occupation of the premises bought. This is called civil or constructive possession, as contra-

distinguished from natural or corporeal possession. Civ. Code, arts. 3427, 3428, 3431.

The intention of the purchaser, which the law presumes coupled with the power which the act of sale gives. vests possession in him. The right is taken for the fact, and the buyer is seised of the thing corporeally by the execution of the title. And this possession continues, whether or not the possessor actually occupies and detains the thing, until he is disturbed in fact or law. Ellis v. Prevost, 13 La. 230.

Hence, it is that one who holds land by such a tenure may defend his title and possession against disturbers or trespassers, and he may call any person into court who claims an adverse title or possession, or who slanders his title. Civil possession will support the possessory action. Handlin v. Lumber Co., 47 La. Ann. 401, 16 South. 955.

While this kind of possession—constructive or civil in character—may not suffice for the prescription by which the ownership of property is aided or acquired (Chamberlain v. Abadie, 48 La. Ann. 587, 19 South. 574), it is, when there is no actual or corporeal possession by the tax debtor, considered a sufficient foundation to support the inhibition established by the Constitution, viz:—that no sale of property for taxes shall be set aside for any cause, except that of dual assessment or the antecedent payment of taxes, unless the proceeding to annul is instituted within three years from the adoption of the Constitution.

The letter and spirit, alike, of the constitutional provision support this view, as do likewise, the situation, conditions and exigencies out of which it grew, and which influenced the framers of the organic law to bring about its enactment.

In part and in brief these were, the general knowledge that, in the aggregate, vast areas of land in the state had been practically abandoned, or forfeited to the state for nonpayment of taxes by the record owners; that these forfeitures had been going on for a quarter of a century or more; that the lands affected by the same were contributing nothing to the support of the state and parochial government, the discharge of the public indebtedness, or to the maintenance of the levee system; that the grants made in the alluvial districts by the Legislature

to the boards of levee commissioners were rendered largely unavailing because of the doubt and uncertainty hanging over the title to much of the lands included in the grants; and that tax titles were more or less in a chaotic state, and the jurisprudence of the state relating thereto uncertain and unsatisfactory.

Private ownership of the lands affected by this condition of affairs was what was aimed at, to the end of their settlement and improvement, the development of their resources, and making them contribute to the support of the fisc. But owing to the precarious character of the ordinary tax title, in the popular mind, this presented a problem of much difficulty.

So the framers of the Constitution cast about to devise some method of solution, some way of creating public confidence in the validity of the tax titles affecting the lands referred to, and in the validity of tax titles generally, and the result of their labors was embodied in the second clause of article 233 of the Constitution. It was intended to announce a future public policy of the state with reference to tax-title tenure of lands.

By article 233 the people of the state, acting through the convention which framed the Constitution, meant to provide a prescription or peremption which would operate to quiet tax titles and thereby settle the ownership of property acquired through them.

As a statute of limitation it was intended to have a more far-reaching effect than what Act No. 105 of 1874 had been allowed by the courts to have.

The great majority of the members of the constitutional convention were lawyers familiar with the tax laws, the adjudications of the courts thereon and the doubt and uncertainty surrounding and attaching to tax titles.

They meant to put an end to this uncertainty and did so by the adoption of article 233. By its enactment they intended to give warning to owners of property that they must look after and keep up with the same in respect to assessment for taxes and payment of taxes, and that if they failed to do so and the property appeared upon the assessment rolls, was proceeded against for nonpayment of taxes and sold and the title

of the purchaser recorded, the owner must, at his peril, bring his suit within the time prescribed ·to set it aside, and if he did not he must forever thereafter hold his peace, except as to the two causes which the article excludes from the operation of the prescriptive limit.

·This law may, in individual cases, now and then work a hardship, but it is sound in principle and· policy and will, it is thought, redound to the public good.

Nor is it amenable to the charge of authorizing the taking of property without due process of law. It is due process of law. It gives a reasonable time—amply so—for property holders, who have defaulted in the matter of looking after the assessment of their property for taxes and the payment of taxes, to save themselves from the consequences of their own neglect. If they continue this neglect by failing to avail themselves of the time allowed, they—not want of due process of law—are responsible for the harm that comes to them.

We hold that tax titles accompanied by actual possession, or constructive possession only in cases where there is no actual possession by any one, are unassailable save for the two causes mentioned, after lapse of the time given the record owner to institute proceedings to annul.

This view, as to constructive possession, contradistinguished from tangible possession, sufficing, finds abundant authority to support it.

The American & English Encyclopædia of Law (1st Ed.) vol. 25, p. 739, has this to say on the subject:—

"When neither party is in actual possession, a valid tax deed draws after it constructive legal possession, and makes it incumbent upon the original owner to bring his action within the period prescribed; and failing to do this, the title of the grantee in the tax deed becomes perfect, as if he had been in actual possession."

A list of adjudicated cases sustaining this declaration is given in note 2 on the same page of the Encyclopædia. See, also, Cooley on Taxation (2d Ed.) p. 558 et seq.; Blackwell on Tax Titles (4th Ed.) p. 643 et seq.

A Wisconsin statute laid it down that any suit or proceeding for the recovery of land sold for taxes, except in cases where the

taxes had been paid or the land redeemed as provided by law, must be commenced within three years from the recording of the tax deed. Under this statute if neither the owner nor the holder of the tax title has taken possession, the owner is barred, the recording of the tax deed being for this purpose equivalent to possession. Knox v. Cleveland, 13 Wis. 245; Dean v. Earley, 15 Wis. 100; Whitney v. Marshall, 17 Wis. 174; Gunnison v. Hoehne, 18 Wis. 268; Lawrence v. Kenney, 32 Wis. 281; Dreutzer v. Baker, 60 Wis. 179, 18 N. W. 776. See, also, Hill v. Kricke, 11 Wis. 442; Sprecker v. Wakeley, 11 Wis. 432; Edgerton v. Bird, 6 Wis. 527, 70 Am. Dec. 473; Parish v. Eager, 15 Wis. 532; Austin v. Holt, 32 Wis. 478; Cutler v. Hurlbut, 29 Wis. 152; Hiles v. La Flesh, 59 Wis. 465, 18 N. W. 435.

The rule that the owner of the tax title is deemed to be constructively in possession is applied in Iowa as well as in Wisconsin, and it is held that he need not bring action to vindicate his title until actual hostile possession is taken by another, and the bar of the statute will be complete in his favor after five years if such hostile possession is not taken. Cooley on Taxation (2d Ed.) pp. 562, 563; Coal Co. v. Blair, 51 Iowa, 447, 1 N. W. 768; Lewis v. Soule, 52 Iowa, 11, 2 N. W. 400; McCaughan v. Tatman, 53 Iowa, 508, 5 N. W. 712; Goslee v. Tearney, 52 Iowa, 455, 3 N. W. 502; Bullis v. Marsh, 56 Iowa, 747, 2 N. W. 578, 6 N. W. 177; Monk v. Corbin, 58 Iowa, 503, 12 N. W. 571.

In Alabama it is said the purpose of the five-year statute of limitation is to give repose to the title of the tax purchaser, if in possession, and to quiet all litigation if he is not in possession, and the limitation begins to run from the time the tax deed is executed. Pugh v. Youngblood, 69 Ala. 269; Jones v. Randle, 68 Ala. 258.

Decisions to the like effect have been made by courts of other states. See Shoat v. Walker, 6 Kan. 73; Sapp v. Morrill, 8 Kan. 677; Mitchell v. Etter, 22 Ark. 178; Robb v. Bowen, 9 Pa. 71; Sheik v. McElroy, 20 Pa. 25; Burd's Ex'rs v. Patterson, 22 Pa. 219; Stewart v. Trevor, 56 Pa. 374; Rogers v. Johnson, 67 Pa. 43, 48; Johnston v. Jackson, 70 Pa. 164.

The word· "sale," as used in the second clause of article 233, is construed to mean a completed sale, which vests such title in the purchaser as gives him "color of right" and places him in a position, either as plaintiff or defendant, to have the legality thereof tested in the courts—this testing to take place, in case the record owner assails the title, within the time prescribed by the article, save as to the two excepted causes. As supporting this see Eldridge v. Kuhl, 27 Iowa, 160; Henderson v. Oliver, 28 Iowa, 20; Mc-Cready v. Sexton, 29 Iowa, 356, 4 Am. Rep. 214; Hurley v. Street, 29 Iowa, 429; Jeffrey v. Brokaw, 35 Iowa, 505; Case v. Albee, 28 Iowa, 277; McNamara v. Estes, 22 Iowa, 246; Douglass v. Tullock, 34 Iowa, 262; Thomas v. Stickle, 32 Iowa, 71; Stevenson v. Bonesteel, 30 Iowa, 286.

With regard to the third class of tax purchasers heretofore mentioned—those who buy property which is tangibly and corporeally in the possession of the tax debtor, and who make no effort to dispossess him—that case does not arise herein and opinion is reserved as to the effect of article 233 of the Constitution with reference thereto.

For the reasons assigned it is ordered and decreed that the judgment of the district court herein be set aside and annulled, and it is now adjudged and decreed that plaintiff company be quieted and confirmed in its title and ownership of the 80 acres of land described in its petition—costs of all the courts to be borne by defendants.

NICHOLLS, C. J., dissents.